

CN

1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA      :   CRIMINAL ACTION
                                    :
 4          VS.                     :
                                    :
 5   LAWRENCE R. MELLON             :   NO. 98-00291-05
                                    :
 6

 7   UNITED STATES OF AMERICA      :   CRIMINAL ACTION
                                    :
 8          VS.                     :
                                    :
 9   RUSSELL SAMUELS                :   NO. 98-00291-06

10                 - - -

11   UNITED STATES OF AMERICA      :   CRIMINAL ACTION
                                    :
12          VS.                     :
                                    :
13   ROBERT REEDER                  :   NO. 98-00291-07

14                 - - -

15   UNITED STATES OF AMERICA      :   CRIMINAL ACTION
                                    :
16          VS.                     :
                                    :
17   JAMES BOYD                     :   NO. 98-00291-08

18              PHILADELPHIA, PENNSYLVANIA
                  TUESDAY, JUNE 29, 1999
19                      - - -
         BEFORE:  THE HONORABLE CLARENCE C. NEWCOMER, SJ.
20
                      SENTENCING
21
                SUZANNE R. WHITE, RPR, CM
22               OFFICIAL COURT REPORTER
                 2722 U. S. COURTHOUSE
23                PHILADELPHIA, PA.
                    (215) 627-1882
24
     PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
25   TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

FILED

MAY 09 2000

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

219





ORIGINAL

```
 1    APPEARANCES:

 2         JOSEPH DOMINGUEZ, ESQUIRE
           CHRISTINE SYKES, ESQUIRE
 3         ASSISTANT U. S. ATTORNEYS
           615 CHESTNUT STREET, SUITE 1250
 4         PHILADELPHIA, PA    19106
           (215) 451-5562
 5
           REPRESENTING THE GOVERNMENT
 6
           DAVID HUFFMAN, ESQUIRE
 7         SUITE 106
           CHADDS FORD PROFESSIONAL CENTER
 8         CHADDS FORD, PENNSYLVANIA  19317
           (610) 358-1550
 9
           REPRESENTING THE DEFENDANT,
10         LAWRENCE MELLOT

11         PETER DAVID MAYNARD, ESQUIRE
           530 WALNUT STREET
12         READING, PENNSYLVANIA  19601
           (610) 375-9733
13
           REPRESENTING THE DEFENDANT,
14         RUSSELL SAMUELS

15         ROBERT J. DONATONI, ESQUIRE
           17 WEST GAY STREET
16         WEST CHESTER, PENNSYLVANIA  19380
           (610) 719-0500
17
           REPRESENTING THE DEFENDANT,
18         ROBERT REEDER

19         WILLIAM T. CANNON, ESQUIRE
           2214 LAND TITLE BUILDING
20         100 SOUTH BROAD STREET
           PHILADELPHIA, PENNSYLVANIA  19110-1022
21         (215) 751-0909

22         REPRESENTING THE DEFENDANT,
           JAMES BOYD
23

24                          -  -  -

25
```

```
1              (9:00 A.M.)

2              (CLERK OPENED COURT.)

3              THE COURT:  GOOD MORNING, EVERYBODY.

4              ALL ATTORNEYS:  GOOD MORNING, YOUR HONOR.

5              THE COURT:  I APOLOGIZE FOR TAKING SO MUCH

6    TIME GETTING ORGANIZED HERE BUT I NEED TO GET

7    ORGANIZED.  I WOULD LIKE TO ASK COUNSEL TO PLEASE SEAT

8    YOUR CLIENTS, REARRANGE THEM, IF YOU WILL.  I ASSUME

9    YOU ARE NOT IN THE ORDER.  THAT IS, ALPHABETICALLY

10   STARTING ON YOUR LEFT AND GOING THIS WAY, SO THE FIRST

11   PERSON SEATED WOULD BE JAMES BOYD AND HIS COUNSEL AND

12   RIGHT DOWN THE LINE IS JAMES BOYD, LAWRENCE MELLOT,

13   ROBERT REEDER AND RUSSELL SAMUELS IN THAT ORDER,

14   PLEASE.  I DON'T WANT TO BE ARBITRARY BUT I NEED TO

15   KNOW WHO I'M SPEAKING TO AND I DON'T KNOW ANY OF YOU.

16   SO THAT'S WHY I'M ASKING YOU TO DO THAT.

17             LET ME ASK YOU, PLEASE, WOULD YOU PLEASE

18   IDENTIFY YOURSELF STARTING AT THIS END.  COUNSEL.  YOU

19   CAN DO IT THROUGH COUNSEL.

20             MR. DOMINGUEZ:  SURE, YOUR HONOR.  MY NAME

21   IS --

22             THE COURT:  STARTING ON THIS END.  ARE YOU

23   REPRESENTING ALL THREE PEOPLE HERE?

24             MR. DOMINGUEZ:  YES, YOUR HONOR.  THEY ARE

25   ALL GOVERNMENT AGENTS.  YOUR HONOR, MY NAME IS JOE
```

1    DOMINGUEZ.  I'M WITH THE U.S. ATTORNEY'S OFFICE.

2    CHRIS SYKES IS WITH ME TO THE RIGHT, DOUG BROSE FROM

3    THE PENNSYLVANIA STATE POLICE AND GREG AULDT FROM THE

4    FBI.

5              ALL IDENTIFIED:  GOOD MORNING, YOUR HONOR.

6              THE COURT:  ALMOST SENTENCED ALL OF YOU.

7              NOW, LET'S COME OVER TO THIS SIDE, PLEASE.

8              MR. CANNON:  WILLIAM T. CANNON, YOUR HONOR,

9    COUNSEL FOR JAMES BOYD.

10              MR. HUFFMAN:  DAVID HUFFMAN, COUNSEL FOR

11    LAWRENCE MELLOT.

12              THE COURT:  THIS IS A VERY LARGE ROOM.  YOU

13    HAVE TO KEEP YOUR VOICE UP GOOD AND LOUD SO WE CAN

14    HEAR IT, ESPECIALLY SO THAT THE REPORTER UP HERE CAN

15    HEAR IT.

16              NEXT.

17              MR. DONATONI:  GOOD MORNING, ROBERT J.

18    DONATONI, ATTORNEY FOR MR. ROBERT REEDER.

19              THE COURT:  VERY WELL.

20              MR. MAYNARD:  GOOD MORNING, YOUR HONOR,

21    PETER DAVID MAYNARD FOR RUSSELL SAMUELS.

22              THE COURT:  GOOD MORNING, SIR.

23              NOW, COUNSEL, I HAVE BEEN INFORMED THAT A

24    PRESENTENCE INVESTIGATION HAS BEEN PERFORMED IN EACH

25    CASE, THAT IT HAS BEEN DONE BY THE PROBATION OFFICE,

1  COPY THEREOF FURNISHED TO BOTH GOVERNMENT AND DEFENSE

2  COUNSEL FOR USE WITH THE DEFENDANT, AND THAT THIS WAS

3  DONE IN A TIMELY FASHION.

4          I ALSO AM INFORMED THAT THERE ARE SOME

5  OBJECTIONS TO THESE REPORTS RESPECTIVELY AND WE WILL

6  HEAR THOSE OBJECTIONS THAT HAVE NOT BEEN RESOLVED AS

7  WE COME TO EACH INDIVIDUAL.

8          THERE ARE CERTAIN THINGS THAT I WOULD LIKE

9  TO REFER TO THAT APPLY TO EVERYONE SINCE THE BASIC

10  FACTUAL SITUATION THAT GAVE RISE TO THESE OFFENSES IS

11  COMMON.

12          I BELIEVE ALL OF THESE INDIVIDUALS WERE THE

13  SUBJECT OF AN INDICTMENT PRESENTED TO THE GRAND JURY

14  IN THE EASTERN DISTRICT OF PENNSYLVANIA ON JUNE 18,

15  1998, CHARGING THEM WITH VARIOUS COUNTS,

16  RESPECTIVELY.

17          ON SEPTEMBER 16 OF 1998, JAMES BOYD

18  APPEARED BEFORE THIS COURT AND PURSUANT TO A PLEA

19  AGREEMENT ENTERED A PLEA OF GUILTY TO COUNTS ONE AND

20  THREE OF THE INDICTMENT.  EACH OF THE DEFENDANTS IN

21  TURN HAS APPEARED BEFORE THIS COURT TO ENTER HIS PLEA

22  OF GUILT TO, I BELIEVE, COUNTS ONE AND THREE, IS THAT

23  CORRECT?

24          MR. DOMINGUEZ:  YOUR HONOR, AS YOU RECALL,

25  ONE OF THE INTERVENING EVENTS WAS THE THIRD CIRCUIT

1    REACHED A DECISION THAT CRIMINAL FORFEITURE WAS A

2    SENTENCING ISSUE AS OPPOSED TO A SEPARATE COUNT OF THE

3    INDICTMENT.

4            SO, AS WITH REGARD TO EACH OF THE

5    DEFENDANTS, EVEN THOUGH I BELIEVE YOU ARE CORRECT, MR.

6    BOYD DID PLEAD GUILTY TO COUNT THREE, WE WOULD BE

7    WITHDRAWING CHARGES ON COUNT THREE TODAY.  WE WILL

8    FILE AN APPROPRIATE MOTION WITH THE COURT DISMISSING

9    THAT COUNT OF THE INDICTMENT IN LIEU OF THE THIRD

10   CIRCUIT PRECEDENT.

11           THE COURT:  VERY WELL.

12           AND AS TO THE OTHER DEFENDANTS, THEY HAVE

13   ENTERED THEIR PLEA OF GUILTY AS TO WHAT COUNTS?

14           MR. DOMINGUEZ:  WELL, YOUR HONOR, SOME HAVE

15   ENTERED A PLEA AS TO ONLY ONE COUNT AND, IF YOU WANT,

16   I CAN GO THROUGH THEM.

17           THE COURT:  I WOULD JUST LIKE TO VERIFY THE

18   ONES I HAVE NOTED HERE.

19           GO AHEAD.

20           MR. DOMINGUEZ:  OKAY.

21           WITH REGARD TO JUST WORKING OUR WAY DOWN

22   THE LINE, MR. MELLOT ENTERED A PLEA ONLY TO COUNT ONE,

23   MR. REEDER ENTERED A PLEA ONLY TO COUNT ONE.  AND MR.

24   SAMUELS ENTERED A PLEA ONLY AS TO COUNT ONE.

25           THE COURT:  ALL RIGHT.

1          MR. BOYD.

2          MR. DOMINGUEZ:  MR. BOYD ENTERED A PLEA AS

3    TO COUNTS ONE AND THREE AND, AGAIN, WE WOULD BE

4    DISMISSING --

5          THE COURT:  YOU ARE WITHDRAWING THE THIRD?

6          MR. DOMINGUEZ:  CORRECT.

7          THE COURT:  I'M NOT GOING TO RESTATE THE

8    BASIC FACTUAL SCENARIO UPON WHICH THESE CHARGES ARE

9    BASED SINCE I'M SURE EVERYBODY IS THOROUGHLY FAMILIAR

10   WITH THEM AT THIS TIME.  IF ANYBODY WOULD LIKE ME TO

11   DO SO, FOR ANY REASON, I WILL BE GLAD TO DO IT,

12   OTHERWISE, I WILL NOT.  THEY ARE FULLY SET FORTH IN

13   EACH OF THE PRESENTENCE REPORTS.

14          IS THAT AGREEABLE, COUNSEL?

15          MR. DONATONI:  IT IS, YOUR HONOR.

16          MR. CANNON:  YES, YOUR HONOR.

17          MR. HUFFMAN:  YES, YOUR HONOR.

18          MR. MAYNARD:  YES, YOUR HONOR.

19          THE COURT:  NOW, I WILL, HOWEVER, NOTE THE

20   OFFENSE LEVEL COMPUTATIONS IN EACH CASE.  THEY ARE SET

21   FORTH IN DETAIL IN MR. BOYD'S CASE.  THEY SHOW A BASE

22   OFFENSE LEVEL OF 26, AND BECAUSE OF HIS ACCEPTANCE OF

23   RESPONSIBILITY BY ENTERING A TIMELY NOTIFICATION TO

24   THE GOVERNMENT OF HIS INTENTION TO PLEAD GUILTY, HE IS

25   ENTITLED UNDER THE GUIDELINES, MAINLY SECTION 3E1.1(A)

1    AND (B) TO A REDUCTION OF THREE LEVELS.  THAT LEAVES

2    HIM WITH A TOTAL OFFENSE LEVEL OF 23.

3           AS TO HIS CRIMINAL HISTORY, THERE IS NONE

4    NOTED AS A JUVENILE BUT, AS AN ADULT, THERE ARE

5    OFFENSES AND CONVICTIONS NOTED IN PARAGRAPHS 55, 56,

6    57 AND 58, WHICH LEAVES HIM WITH TOTAL CRIMINAL

7    HISTORY POINTS OF 15, PLUS 2 ADDITIONAL CRIMINAL

8    HISTORY -- WELL, INCLUDING TWO ADDITIONAL CRIMINAL

9    HISTORY POINTS SINCE THE INSTANT OFFENSE WAS COMMITTED

10    WHILE HE WAS UNDER SUPERVISION IN BOTH CHESTER AND

11    LANCASTER COUNTIES.

12           SO, THE TOTAL CRIMINAL HISTORY POINTS IS

13    15.  UNDER THE SENTENCING TABLE, CHAPTER FIVE, PART A,

14    13 OR MORE CRIMINAL HISTORY POINTS ESTABLISHES A

15    CRIMINAL HISTORY CATEGORY OF ROMAN NUMERAL VI.

16           A TOTAL OFFENSE LEVEL OF 23 WITH CRIMINAL

17    HISTORY CATEGORY OF ROMAN NUMERAL VI PLACES HIM IN A

18    GUIDELINE CUSTODY BRACKET OF 92 TO 115 MONTHS.

19           YOU EACH HAVE RECEIVED, I BELIEVE, A COPY

20    OF THE SENTENCING RECOMMENDATION ISSUED BY THE

21    PROBATION OFFICE AND THOSE MATTERS ARE REFLECTED ON

22    THAT REPORT.

23           I HAVE NO NOTE OF ANY OBJECTIONS THAT HAVE

24    BEEN FILED BY EITHER THE GOVERNMENT OR THE DEFENDANT

25    AS TO THIS REPORT.

1    IS THAT CORRECT, COUNSEL?

2    MR. DOMINGUEZ: THAT'S CORRECT FOR THE

3 GOVERNMENT.

4    MR. CANNON: THAT'S CORRECT, YOUR HONOR,

5 FOR MR. BOYD.

6    THE COURT: VERY WELL.

7    I WOULD -- MR. CANNON, I'M PREPARED TO HEAR

8 WHATEVER STATEMENT YOU WISH TO MAKE ON BEHALF OF YOUR

9 CLIENT OR PRESENT ANY EVIDENCE, IF THAT BE THE CASE.

10    MR. CANNON: YES, YOUR HONOR.

11    THE COURT: BEAR IN MIND, PLEASE -- I SAY

12 THIS TO ALL OF YOU -- THAT I HAVE READ EACH OF THE

13 REPORTS CAREFULLY, AND I HAVE READ ALL OF THE

14 SUBMISSIONS IN THE FORM OF LETTERS AND OTHERWISE THAT

15 HAVE BEEN SUBMITTED BY COUNSEL AND THEY WILL BE PLACED

16 ON -- WITH THE RECORD IN THE CASE. I WOULD ASK THAT

17 YOU, IN MAKING YOUR PRESENTATIONS AND IN THE EVENT

18 THAT YOU HAVE ANY WITNESSES WHO YOU WISH TO HAVE

19 TESTIFY, THAT YOU AVOID REPETITIVE TYPE TESTIMONY,

20 DUPLICATIVE TYPE TESTIMONY, BEARING IN MIND THAT I

21 HAVE, INDEED, READ ALL THE THINGS THAT I HAVE TOLD YOU

22 ABOUT.

23    NOW, MR. CANNON, THANK YOU FOR BEARING WITH

24 ME.

25    MR. CANNON: YES, YOUR HONOR. I WOULD LIKE

1    TO CALL PETER D'ONOFRIO TO ADDRESS THE COURT.

2              MAY HE APPROACH THE ROSTRUM?

3              THE COURT:   YES.

4              THE CLERK:   RIGHT UP HERE, SIR.

5              STATE YOUR FULL NAME AND SPELL YOUR LAST.

6              THE WITNESS:   D'ONOFRIO, D-'-O-N-O-F-R-I-O,

7    PETER.

8              PETER D'ONOFRIO, DEFENSE WITNESS, SWORN

9                   DIRECT EXAMINATION

10   BY MR. CANNON:

11   Q.   MR. D'ONOFRIO, YOU'RE A BUSINESSMAN, SIR?

12   A.   YES.

13   Q.   WOULD YOU TELL JUDGE NEWCOMER, MR. D'ONOFRIO, THE

14   NATURE OF YOUR BUSINESS?

15   A.   I'M A CONCRETE CONTRACTOR.

16   Q.   AND WHERE ARE YOU LOCATED?

17   A.   WEST CHESTER.

18   Q.   HOW LONG HAVE YOU BEEN THERE?

19   A.   SINCE '85.

20   Q.   OKAY.

21              AND WHAT DOES JIM BOYD DO FOR YOUR COMPANY?

22   A.   HE'S A CEMENT FINISHER AND FOREMAN.

23   Q.   AND HOW LONG HAS JIM BEEN ASSOCIATED WITH

24   D'ONOFRIO?

25   A.   HE CAME ABOUT TWO AND A HALF YEARS AGO AND WORKED

1    WITH US FOR A WHILE AND THEN WE GOT SLOW.  AND HE WENT

2    BACK WITH HIS PREVIOUS EMPLOYER.  AND HE CAME BACK

3    WITH US A LITTLE OVER A YEAR AGO.

4    Q.    COULD YOU DESCRIBE FOR JUDGE NEWCOMER THE

5    QUALITIES THAT JIM BRINGS TO THE WORKPLACE DURING THE

6    TIME THAT HE HAS BEEN EMPLOYED BY YOU?

7    A.    ALL I CAN SAY IS THAT JIM IS ONE OF THE BEST

8    EMPLOYEES WE HAVE.  AS A CONCRETE CONTRACTOR, WE NEED

9    PEOPLE THAT WORK HARD AND ARE DEPENDABLE.  SOMETIMES

10   WE START AT FOUR O'CLOCK IN THE MORNING TO POUR

11   CONCRETE.  THEY MIGHT BE THERE UNTIL 11, 12 O'CLOCK AT

12   NIGHT.  WE WORK SATURDAYS SOMETIMES.  JIM IS ALWAYS

13   THERE.  HE IS RESPECTED BY HIS FELLOW EMPLOYEES.  THEY

14   LOOK UP TO HIM, WORK WITH HIM AND WHEN HE IS A FOREMAN

15   OVER THEM, HE IS ALWAYS PREPARED AND HE IS JUST ONE OF

16   THE BEST EMPLOYEES I HAVE.  HE NEVER COMPLAINS.  HE

17   DOES WHATEVER IS EXPECTED.  HE IS CONSCIENTIOUS.  EVEN

18   OUR CLIENTS AND CONTRACTORS THAT WE WORK FOR NEVER

19   HAVE ANY PROBLEMS WITH HIM.  WE PUT A LOT OF TRUST IN

20   HIM, WHEN WE SEND HIM OUT WITH TOOLS AND EVERYTHING.

21   HE IS RESPONSIBLE FOR A LOT OF MATERIAL AND EQUIPMENT

22   AND ALL.  HE HAS ALWAYS PERFORMED VERY --

23            THE COURT:  COUNSEL, I UNDERSTAND THIS.

24            MR. CANNON:  OKAY.  I HAVE NO OTHER

25   QUESTIONS, YOUR HONOR.

1    THE COURT:  GOVERNMENT COUNSEL HAVE ANY

2  QUESTIONS?

3    MR. DOMINGUEZ:  I DON'T, SIR.  THANK YOU

4  VERY MUCH FOR COMING.

5    THE WITNESS:  COULD I SAY ONE OTHER THING?

6    THE COURT:  SURE.

7    THE WITNESS:  THIS IS A SELFISH REMARK ON

8  MY PART.  IS THAT WE ARE A SMALL COMPANY, AND IT'S SO

9  HARD ANY MORE TO FIND GOOD PEOPLE, AND JIM, IT WOULD

10  BE A BIG LOSS TO US.  IF THERE WOULD BE SOME WAY THAT

11  HE COULD WORK FOR US.

12    MR. CANNON:  YOUR HONOR, I WOULD LIKE TO

13  CALL MR. BOYD'S FATHER, JAMES BOYD.

14    THE CLERK:  STATE YOUR NAME FOR THE

15  RECORD.

16    THE WITNESS:  JAMES BOYD, B-O-Y-D.

17    JAMES BOYD, DEFENSE WITNESS, SWORN.

18    DIRECT EXAMINATION

19  BY MR. CANNON:

20  Q.  HI, MR. BOYD.

21    YOU ARE JIM'S FATHER?

22  A.  YES, I AM.

23  Q.  HOW MANY CHILDREN DO YOU HAVE?

24  A.  FOUR.

25  Q.  WHERE DOES JIM COME IN?

1    A.    ONE.

2    Q.    HE IS THE FIRST CHILD?

3    A.    EXCUSE ME.  I HAVE NEVER -- YES.  I'M VERY

4    PARTIAL.  HE IS MY SON.  I HAVE ALWAYS LOVED HIM.

5              THE COURT:  I WOULD ASSUME THAT.  GO

6    AHEAD.

7              THE WITNESS:  I HAVE NEVER CHOSEN HIM AS A

8    FRIEND, YOU KNOW, UNTIL HE ENTERED THE PROGRAM A YEAR

9    AGO, BUT I'M SORRY.

10   BY MR. CANNON:

11   Q.    THAT'S OKAY.  WHEN YOU SAY THAT FOR A LONG TIME

12   YOU DID NOT REGARD HIM AS A FRIEND, WHAT DO YOU MEAN

13   BY THAT?

14   A.    NO, WHEN HE WAS UNDER THE INFLUENCE OF DRUGS AND

15   ALCOHOL, HE JUST ERUPTED THE WHOLE FAMILY.  JUST

16   DISTURBED IT.  I STILL LOVED HIM BUT I DIDN'T WANT HIM

17   AROUND.  I TRIED TO BRING HIM UP THE WAY MY FATHER

18   BROUGHT ME UP, AND MAYBE IT WAS THE WRONG THING.  IT

19   DIDN'T WORK.  THE PROGRAM, HE WENT TO THE PROGRAM FOR

20   A MONTH AND A HALF, AND HE IS A COMPLETELY DIFFERENT

21   YOUNG MAN.  YOU KNOW, I CAN CALL HIM MY FRIEND NOW.

22              SO AND AS FAR AS WORK, HE ALWAYS CALLS IN.

23   HE'S JUST RESPONSIBLE NOW.  BEFORE IT WAS, HE WAS JUST

24   A DRUG ADDICT.

25   Q.    YOU SEE THE DIFFERENCE SIMPLY IN THE FACT THAT

1    FOR NINE MONTHS HE HAS BEEN DRUG AND ALCOHOL FREE?

2    A.    YES.

3    Q.    OKAY.

4           MR. CANNON:  THANK YOU VERY MUCH, MR.

5    BOYD.

6           THE COURT:  DOES COUNSEL HAVE ANY QUESTIONS

7    OF MR. BOYD?

8           MR. DOMINGUEZ:  NO, SIR.

9           THANK YOU FOR YOUR CANDOR.

10          MR. CANNON:  YOUR HONOR, I CALL JIM'S

11   SISTER, BRENDA BOYD.

12          THE CLERK:  STATE YOUR FULL NAME AND SPELL

13   YOUR LAST NAME FOR THE RECORD.

14          THE COURT:  WILL SHE HAVE SOMETHING NEW TO

15   ADD OTHER THAN THE FACT THAT THEY ARE BROTHER AND

16   SISTER AND SHE LOVES HIM?  THAT KIND OF TESTIMONY IS

17   NOT OF MUCH VALUE.

18          MR. CANNON:  IT IS NOT WHAT, JUDGE?

19          THE COURT:  IT IS NOT OF MUCH VALUE.

20          MR. CANNON:  I'M SORRY TO HEAR THAT.

21          THE COURT:  JUST TO TELL THAT THEY ARE

22   RELATED.  IF YOU HAVE SOMETHING THAT YOU WANT THE

23   COURT TO KNOW ABOUT, THAT I DON'T ALREADY KNOW, THEN I

24   WILL WELCOME THAT.

25          MR. CANNON:  WELL, LET ME SAY THAT THERE IS

1    A LARGE GROUP OF FAMILY MEMBERS WHO CAME AND ALL YOU

2    ARE HEARING FROM ARE TWO AND THESE TWO WERE SELECTED

3    BECAUSE THEY HAD THE MOST TO SAY, JUDGE.

4              THE COURT:  VERY WELL.

5              MR. CANNON:  THANK YOU, JUDGE.

6              THE CLERK:  STATE AND SPELL YOUR FULL NAME

7    FOR THE RECORD.

8              THE WITNESS:  BRENDA A. BOYD, B-O-Y-D.

9              BRENDA A. BOYD, DEFENSE WITNESS, SWORN.

10                  DIRECT EXAMINATION

11   BY MR. CANNON:

12   Q.    BRENDA, WHAT DO YOU DO?

13   A.    I AM A COMPUTER PROGRAMMER.

14   Q.    AND --

15              THE COURT:  I'M SORRY, A WHAT?

16              THE WITNESS:  COMPUTER PROGRAMMER.

17   BY MR. CANNON:

18   Q.    AND WHERE DO YOU COME IN WITH REGARD TO JIM?

19   A.    I AM SECOND FROM THE LAST.  I'M ABOUT THREE YEARS

20   YOUNGER THAN HIM.

21   Q.    AND THERE ARE TWO OTHER SIBLINGS BESIDES YOURSELF

22   AND JIM?

23   A.    YES.

24   Q.    THEY WOULD BE YOUR SISTER, THERESA?

25   A.    YES.

1    Q.    OKAY.

2    A.    YOUNGER BROTHER, CHRISTOPHER.

3    Q.    ALL RIGHT.  IS IT A FACT THAT JIM'S DAUGHTER,

4    KELLY, AGE 16, IS ALSO PRESENT IN COURT TODAY?

5    A.    YES.

6    Q.    ALONG WITH HIS GRANDMOTHER, THERESA BOYD, IS THAT

7    CORRECT?

8    A.    YES.

9    Q.    NOW, YOU HAVE ASKED ME FOR AN OPPORTUNITY TO

10   ADDRESS JUDGE NEWCOMER AND TO TELL HIM SOME THINGS

11   ABOUT JIM THAT YOU WOULD JUST LIKE HIM TO KNOW IN

12   FASHIONING AN APPROPRIATE SENTENCE.

13   A.    WELL, YOUR HONOR, LIKE YOU SAID, I GUESS YOU

14   KNOW, YOU FIGURE WE ARE ALL GOING TO BE PARTIAL

15   BECAUSE HE IS OUR BROTHER.  I SPEAK FOR, I GUESS, THE

16   WHOLE FAMILY, THE SIBLINGS, AND ALL HIS NIECES AND

17   NEPHEWS.  HE HAS DEFINITELY BECOME A CHANGED MAN IN

18   THE PAST YEAR.  HE HAS BECOME A PART OF THE FAMILY

19   MORE THAN HE EVER HAS BEEN.  WE SPEND TIME TOGETHER.

20   HE IS JUST A TOTALLY DIFFERENT PERSON.  TO SEND HIM

21   AWAY NOW WOULD BE VERY DETRIMENTAL, I THINK, TO THE

22   WHOLE FAMILY.

23   Q.    YOU KNEW HIM WHEN THINGS WERE BAD?

24   A.    YEAH, I KNEW HIM ALL MY LIFE.

25   Q.    AND THE CHANGE HAS COME OVER HIM SINCE HE HAS

1   BEEN DRUG FREE?

2   A.   ABSOLUTELY REMARKABLE.  I HAVE NEVER -- I NEVER

3   ACTUALLY NEVER REALLY BELIEVED THAT HE COULD CHANGE

4   LIKE HE DID.  I NEVER BELIEVED IT.

5   Q.   LASTLY, WOULD YOU SAY THAT YOU ARE CLOSER TO JIM

6   NOW AS A RESULT OF THE CHANGES?

7   A.   DEFINITELY.  HE STOPS BY MY HOUSE, YOU KNOW, JUST

8   TO SAY HI.  WE SIT AND TALK AND HE HELPS ME DO THINGS

9   AROUND THE HOUSE.

10  Q.   FINE.  OKAY.

11           MR. CANNON:  DOES GOVERNMENT COUNSEL HAVE

12  ANY QUESTIONS?

13           MR. DOMINGUEZ:  NO, I DON'T.  THANK YOU.

14           MR. CANNON:  THANK YOU.

15           JUDGE, I'M GOING TO ASK THE COURT TO HEAR,

16  AT SIDE BAR, SOME TESTIMONY AND IF I COULD ASK THE

17  COURT TO SEE THE COURT AT SIDE BAR FOR A MOMENT, I CAN

18  EXPLAIN THE NATURE OF THAT TESTIMONY.

19           THE COURT:  I SEE NO REASON WHY WE SHOULD

20  HAVE A SIDE BAR ON A PUBLIC SENTENCING.

21           MR. CANNON:  WELL, IF I MAY BE HEARD

22  RESPECTFULLY, JUST BRIEFLY, JUDGE, I CAN EXPLAIN THE

23  REASON FOR THAT.

24           DOES GOVERNMENT COUNSEL CONCUR THAT WE

25  OUGHT TO SEE THE COURT AT SIDE BAR?

1            MR. DOMINGUEZ:  YOUR HONOR, IF HE IS

2   TALKING ABOUT POTENTIAL 5K.1 ISSUES, I THINK THERE IS

3   PROBABLY AN ISSUE WITH REGARD TO THIS DEFENDANT THAT

4   WE COULD ADDRESS AT SIDE BAR.

5            THE COURT:  WELL, IF IT COMES TO 5K.1 THE

6   DECISION IS TOTALLY IN THE HANDS OF YOUR DEPARTMENT,

7   NOT MINE.  BUT COME TO THE SIDE BAR.  WE WILL FIND OUT

8   WHAT YOU ARE TALKING ABOUT.

9            (SIDE-BAR.)

10            MR. DOMINGUEZ:  YOUR HONOR, THERE'S A

11   SEPARATE REASON THAT I WANTED TO ASK TO SEE YOU AT

12   SIDE BAR.  I AM AWARE --

13            THE COURT:  YOU SHOULD HAVE SEEN ME ABOUT

14   THIS BEFORE NOW.  WE WOULD NOT HAVE TO TAKE

15   EVERYBODY'S TIME TO DO THIS, BUT GO AHEAD.

16            MR. DOMINGUEZ:  YOUR HONOR, YOU WILL HEAR

17   IN A MOMENT; IT JUST AROSE.  WHEN WE WENT THROUGH THE

18   INITIAL COLLOQUY YOU DID NOT ASK THE DEFENDANTS IF

19   THEY HAD READ THEIR OWN PSI'S.  I'M AWARE OF A VERY

20   RECENT OPINION, UNFORTUNATELY, I CANNOT GIVE YOU A

21   CITE FOR THAT OPINION, I JUST SAW THE EVENT SHEET THAT

22   SAYS THAT THAT IS REVERSIBLE ERROR NOT GOING THROUGH

23   THAT COLLOQUY.  AND I DON'T KNOW --

24            THE COURT:  THIRD CIRCUIT?

25            MR. DOMINGUEZ:  I DON'T KNOW, YOUR HONOR.

1    I DON'T REMEMBER MAKING NOTE OF IT.  IN AN ABUNDANCE

2    OF CAUTION, I DID NOT KNOW ABOUT IT.  I WANTED TO

3    POINT IT OUT TO THE COURT, SO IT DID CATCH MY

4    ATTENTION AND I DON'T KNOW IF IT'S SOMETHING THAT

5    WOULD HAVE COME UP IN THE LATER PART OF THE COLLOQUY.

6    IF IT WAS, I'M SORRY FOR WASTING THE COURT'S TIME.

7          MR. CANNON:  THE REASON I ASKED TO COME TO

8    SIDE BAR IS THAT THERE IS AN FBI AGENT, AS WELL AS

9    STATE TROOPER, WITH WHOM MR. BOYD HAS DONE EXTENSIVE

10    UNDERCOVER OPERATIONS THAT THE PUBLIC AND A LOT OF

11    PEOPLE WHO ARE HERE KNOW MR. BOYD THAT THIS KIND OF

12    INFORMATION SHOULD NOT BE DISCLOSED TO THESE PEOPLE,

13    WHICH IS WHY I WOULD ASK TO TAKE THIS TESTIMONY HERE

14    AT SIDE BAR STARTING WITH THE TESTIMONY OF SPECIAL

15    AGENT GREG AULDT OF THE FBI.  HE IS SIMPLY GOING TO

16    COME TO SIDE BAR AND TELL THE COURT THE NATURE OF THE

17    COOPERATION THAT MR. BOYD HAS LENT TO HIS OFFICE.

18          MR. DOMINGUEZ:  YOUR HONOR, THESE ARE

19    ONGOING INVESTIGATIONS.  NOW WE COULD DEAL WITH IT BY

20    SIMPLY ADVISING THE COURT I THINK, I DON'T WANT TO

21    DISTRACT FROM WHAT MR. CANNON IS TRYING TO DO HERE,

22    SIMPLY ADVISING THE COURT THAT AS WITH REGARD TO THIS

23    DEFENDANT AND ANOTHER DEFENDANT, MR. SAMUELS, I THINK

24    I CAN SAY HERE, THERE IS SOME ONGOING COOPERATION THAT

25    THEY ARE BOTH DOING.  NOW, IF THE COURT HAS SPECIFIC

1    QUESTIONS AS TO WHAT THAT COOPERATION IS, MAYBE IT

2    MAKES SENSE TO HAVE THIS TESTIMONY, BUT I CAN

3    CERTAINLY REPRESENT THAT AS A GOVERNMENT OFFICIAL, AT

4    THIS POINT, I DID NOT WANT TO MAKE IT A PART OF THE

5    PUBLIC RECORD.

6            MR. CANNON:  IT IS NOT JUST THAT JIM IS

7    COOPERATING IN AN INVESTIGATION THAT IS PRESENTLY

8    ONGOING, BUT I WANT MR. AULDT TO TELL THE COURT ABOUT

9    THE EXTENSIVE COOPERATION HE HAS ALREADY LENT TO THE

10   FBI OUTSIDE THE CURRENT INVESTIGATION.

11           THE COURT:  IS THERE ANY REASON THAT THAT

12   CAN'T BE DISCLOSED HERE?

13           MR. CANNON:  YES, BECAUSE IT WOULD BE

14   EMBARRASSING TO MR. BOYD TO HAVE THESE PEOPLE OUT HERE

15   KNOW THAT HE HAS BEEN A GOVERNMENT SNITCH BASICALLY,

16   JUDGE, FOR A LONG TIME.  HE STILL HAS TO DEAL WITH

17   THESE PEOPLE IN THE COMMUNITY.

18           THE COURT:  THEY DON'T KNOW THAT.

19           MR. CANNON:  NO.  NO.  IT'S NOT LIKE THE

20   GOVERNMENT HAS DISCLOSED TO OTHER DEFENDANTS IN THIS

21   CASE WHAT MR. BOYD AND OTHERS HAVE DONE.  I DON'T KNOW

22   WHAT OTHER DEFENDANTS IN THIS CASE HAVE DONE FOR THE

23   GOVERNMENT AND IT'S NOT MY BUSINESS, BUT I THINK IT'S

24   THE COURT'S BUSINESS TO KNOW WHAT MR. BOYD HAS DONE

25   FOR THE GOVERNMENT WHILE HE HAS BEEN COOPERATING, SO I

1    WOULD ASK LEAVE TO JUST HAVE MR. AULDT COME OVER HERE

2    AND JUST --

3              THE COURT:  WELL, ORDINARILY, THE

4    GOVERNMENT AND ALSO COUNSEL TELL ME IN THEIR

5    RESPECTIVE MEMORANDA EXACTLY WHAT THE DEFENDANT HAS

6    DONE IN THE WAY OF COOPERATION AND WHY HE SHOULD

7    RECEIVE CONSIDERATION FOR THAT.  DO I HAVE THAT, YOUR

8    REPORT?

9              MR. DOMINGUEZ:  YOU DO, YOUR HONOR.  WE ARE

10   SATISFIED WITH THE SUBMISSION.  WE HAVE GIVEN YOU --

11             THE COURT:  DO I HAVE ANYTHING FOR YOU?

12             MR. CANNON:  NO, JUDGE, BECAUSE IT'S ONE

13   THING FOR ME TO TELL THE COURT IN WRITTEN MEMORANDUM

14   BUT IT'S ANOTHER THING.

15             THE COURT:  YOU HAVE A COPY OF WHAT THE

16   GOVERNMENT GAVE ME.

17             MR. CANNON:  I GOT A COPY THIS MORNING,

18   JUDGE, GIVEN TO ME FROM THE GOVERNMENT.  I TOLD JOE

19   THIS MORNING I DID NOT GET ANYTHING FROM THE

20   GOVERNMENT IN THE MAIL AS OF YESTERDAY.  I RECEIVED IT

21   THIS MORNING.

22             THE COURT:  WHAT YOU WANT TO DO IS CALL THE

23   AGENT UP TO SIDE BAR TO TAKE SOME TESTIMONY.

24             MR. CANNON:  JUST A FEW QUESTIONS.

25             THE COURT:  CALL HIM UP.

1       MR. CANNON:  GOOD.

2       MR. DOMINGUEZ:  GREG.

3       MR. CANNON:  WOULD IT BE OKAY FOR MR. BOYD

4   TO BE PRESENT WHILE TAKING THIS TESTIMONY?  IT IS HIS

5   SENTENCING, I THINK HE SHOULD BE ABLE TO HEAR THIS.

6       THE COURT:  YES.  YES.

7       MR. CANNON:  MR. BOYD.

8       MR. DOMINGUEZ:  JUST BEFORE WE GET GOING, I

9   THINK, OBVIOUSLY, WHAT THESE DEFENDANTS HAVE TESTIFIED

10  TO IN THIS CASE HAS BEEN -- IN THIS CASE HAS BEEN

11  DISCLOSED TO EVERYONE.  WE WOULD HAVE TO DISCLOSE THAT

12  TO ALL THE OTHER DEFENDANTS.  WE HAVE DISCLOSED MR.

13  BOYD'S GRAND JURY TESTIMONY AS WELL AS ALL THE OTHER

14  REPORTS.  IF THERE IS SOMETHING OUTSIDE OF THAT, THEN

15  I THINK IT MAY BE THE BASIS FOR SOME ADDITIONAL

16  TESTIMONY.  EVERYBODY IN THIS COURTROOM KNOWS WHAT JIM

17  BOYD DID ON THIS INVESTIGATION AS THEY WOULD HAVE TO

18  KNOW BECAUSE WE WOULD HAVE TO TURN IT OVER.

19      THE COURT:  THAT'S WHAT I ASKED A MOMENT

20  AGO.

21      MR. DOMINGUEZ:  RIGHT.

22      THE COURT:  YOU SAID NO.

23      MR. CANNON:  I THOUGHT MR. DOMINGUEZ AGREED

24  WITH ME THAT NOT EVERYONE, NOT ALL THE DEFENDANTS

25  BEING SENTENCED TODAY, ARE PRIVY TO WHAT OTHERS HAVE

1     DONE.

2              MR. DOMINGUEZ:  ONLY AS WITH REGARD TO

3     ANYTHING OUTSIDE THIS INVESTIGATION, OVER AND ABOVE

4     THIS INVESTIGATION.  BUT EVERYTHING PERTAINING TO THIS

5     INVESTIGATION, WE PROVIDED A FOOT OF DISCOVERY TO

6     EVERYBODY.  YOU GOT THE SAME PACKAGE EVERYBODY ELSE

7     DID.

8              MR. CANNON:  COULD WE TAKE THE TESTIMONY OF

9     MR. AULDT, JUDGE?

10             THE COURT:  WELL, I DON'T KNOW.  I'M

11    CONCERNED NOW, FROM WHAT THE GOVERNMENT COUNSEL SAYS,

12    THAT THIS IS SOMETHING THAT WE WILL HAVE TO PROVIDE

13    ALL THE OTHER DEFENDANTS WITH.

14             MR. DOMINGUEZ:  NO, YOUR HONOR.  I'M JUST

15    SAYING I DON'T HAVE A PROBLEM WITH MR. CANNON ASKING

16    MR. AULDT SOME QUESTIONS AS LONG AS HE CAN LIMIT IT TO

17    A FEW REGARDING COOPERATION OUTSIDE THIS CASE.

18             THE COURT:  ALL RIGHT.  GO AHEAD.  JUST,

19    PLEASE, NEXT TIME YOU HAVE A CASE WITH ME AT LEAST,

20    LET'S DO THIS IN ADVANCE OF THE SENTENCING.  GO

21    AHEAD.

22             THE CLERK:  STATE YOUR FULL NAME AND SPELL

23    YOUR LAST NAME FOR THE RECORD.

24             GREGORY AULDT, GOVERNMENT'S WITNESS, SWORN.

25             THE WITNESS:  GREGORY AULDT, A-U-L-D-T,

1    GREGORY, G-R-E-G-O-R-Y, MIDDLE INITIAL J.

2                    DIRECT EXAMINATION

3    BY MR. CANNON:

4    Q.    MR. AULDT, YOU ARE WITH THE FBI?

5    A.    YES, I AM.

6    Q.    YOU HAVE BEEN THE PRIMARY AGENT ON THIS

7    INVESTIGATION?

8    A.    YES, I HAVE.

9    Q.    AND I HAVE ASKED YOU TO COME TO SENTENCING TODAY

10   AND TO ADVISE JUDGE NEWCOMER ABOUT THE EXTENT OF THE

11   COOPERATION THAT MR. BOYD HAS LENT TO YOUR OFFICE

12   DURING THIS INVESTIGATION AND HIS INVOLVEMENT IN OTHER

13   PERIPHERAL MATTERS?

14   A.    YES.

15   Q.    WOULD YOU DO THAT, PLEASE.

16   A.    SURE.   MR. BOYD -- I INTRODUCED MR. BOYD TO A

17   DETECTIVE IN DELAWARE COUNTY BY THE NAME OF DETECTIVE

18   JAMES FRY, WORKS FOR THE DELAWARE COUNTY DISTRICT

19   ATTORNEY'S OFFICE NARCOTICS DIVISION, AND JIMMY BOYD

20   WAS WORKING WITH DETECTIVE FRY, TRIED TO MAKE BUYS ON

21   LOCAL DRUG DEALERS IN DELAWARE COUNTY, BUYS FROM LOCAL

22   DRUG DEALERS IN DELAWARE COUNTY.

23   Q.    ARE YOU AWARE ALSO OF THE INVOLVEMENT OF MR. BOYD

24   WITH STATE TROOPER BROSE, WHO IS HERE TODAY?

25   A.    YEAH, HIS INVOLVEMENT I THINK IS THE SAME AS WITH

1    ME.

2    Q.    THE JUDGE DOES NOT KNOW ABOUT THAT.    DESCRIBE

3    WHAT THAT IS ABOUT.

4    A.    IN THIS INVESTIGATION, HIS COOPERATION IN THIS

5    INVESTIGATION.

6    Q.    HOW WOULD YOU DESCRIBE THE NATURE OF HIS

7    COOPERATION IN THIS MATTER?

8    A.    JIMMY WAS UPFRONT FROM THE BEGINNING.    HE WAS

9    HONEST, COOPERATIVE, AND I WOULD CLASSIFY HIS

10    COOPERATION AS EXTREMELY VALUABLE.

11    Q.    EXTREMELY VALUABLE.    OKAY.    ALL RIGHT.

12                MR. CANNON:    JUDGE, THAT'S WHAT I WANTED.

13                THE COURT:    ANY QUESTIONS?

14                MR. DOMINGUEZ:    NO, YOUR HONOR.

15                THE COURT:    ALL RIGHT.    THAT'S IT.

16                (WHEREUPON THE SIDE BAR CONFERENCE ENDED.)

17                MR. CANNON:    JUDGE, BEFORE WE HEAR FROM MR.

18    BOYD, I WOULD LIKE, OF COURSE, AN OPPORTUNITY TO

19    ADDRESS THE COURT.

20                I DID NOT HAVE ANY CHALLENGE TO THE CONTENT

21    OF THE PRESENTENCE REPORT.    IT WAS ACCURATELY

22    PREPARED.    ALL THE INFORMATION WAS CORRECT.    I DO

23    THINK THE COURT MIGHT VIEW THE CRIMINAL HISTORY OF MR.

24    BOYD AS SOMEWHAT OVERREPRESENTING THE SERIOUSNESS OF

25    MR. BOYD'S CRIMINAL BACKGROUND.    YOUR HONOR JUST TOOK

1    A GLANCE AT PAGE 11 OF THE PSI, WITH REGARD TO HIS

2    ADULT CRIMINAL CONVICTIONS.  YOUR HONOR CAN SEE THAT

3    THREE OF THOSE POINTS ARE ATTRIBUTABLE TO A SIMPLE

4    ASSAULT CASE BACK IN CHESTER COUNTY, AND THAT SIX MORE

5    OF THOSE POINTS ARE BOTH -- ARE ATTRIBUTABLE SIMPLY TO

6    DRIVING UNDER THE INFLUENCE.

7           NOW, DRIVING UNDER THE INFLUENCE IS A

8    SERIOUS OFFENSE, BUT IT'S AN OFFENSE THAT IS PERSONAL

9    TO THE INDIVIDUAL.  IT'S NOT THE KIND OF CRIMINALITY

10   THAT INVOLVES HARM TO OTHERS, IN TERMS OF ANY INTENDED

11   VIOLENT ACTS OR ANY INVOLVEMENT IN ANY OVERT CRIMINAL

12   BEHAVIOR.

13          SO I THINK THAT, OF COURSE, ALL OF THESE

14   OFFENSES --

15          THE COURT:  EXCEPT WHEN THEY RECUR

16   REPEATEDLY, OPERATING WHILE UNDER SUSPENSION,

17   OPERATING UNDER THE INFLUENCE OF ALCOHOL, THEY DO

18   BECOME POTENTIALLY VIOLENT.

19          MR. CANNON:  AND, YOU KNOW, WE FROWN

20   INCREASINGLY ON THESE KIND OF OFFENSES INVOLVING

21   DRIVING WHILE UNDER THE INFLUENCE OF ALCOHOL OR DRUGS,

22   BUT THEY TOOK PLACE AT A TIME WHEN THE COURT KNOWS AND

23   THE GOVERNMENT KNOWS THAT MR. BOYD WAS IN THE THROES

24   OF A BAD DRUG HABIT.

25          MR. BOYD, AS PART OF HIS COOPERATION IN

1   THIS CASE AND AT THE RECOMMENDATION OF PRETRIAL

2   SERVICES, ENTERED INTO MEREMONT IN EARLY SEPTEMBER OF

3   LAST YEAR.  AND I DID PROVIDE TO THE COURT A

4   CERTIFICATE FROM MEREMONT INDICATING HIS SUCCESSFUL

5   COMPLETION OF THAT PROGRAM.

6           I ALSO, AS YOUR HONOR KNOWS, SUBMITTED A

7   SEPARATE MEMORANDUM FROM A FOLLOW-UP PROGRAM THAT MR.

8   BOYD HAS BEEN PARTICIPATING IN, AND WHICH HE HAS

9   ATTENDED FAITHFULLY AND HAS NOT MISSED A SINGLE

10  APPOINTMENT WITH THE PSYCHOTHERAPIST WHO HAS BEEN

11  WORKING WITH HIM AT THE RIVERSIDE CARE PROGRAM, A

12  YOUNG LADY BY THE NAME OF KATHLEEN SMITH.

13          I THINK THAT IT'S OBVIOUS THAT MR. BOYD HAS

14  AN INTENSE DESIRE TO STAY CLEAN AND NOT TO REVERT TO

15  THE KIND OF DRUG OR ALCOHOL DEPENDENCY THAT GOT HIM

16  INTO THE DIFFICULTY THAT HE IS HERE TODAY.

17          MR. BOYD, JUDGE, WHO I'M ABOUT TO PRESENT

18  TO YOU, IS AN EXTREMELY ENGAGING AND LIKABLE

19  INDIVIDUAL WHO, AT A TIME THAT IS SOMEWHAT REMOTE NOW,

20  WE ARE TALKING ABOUT ACTIVITIES THAT TOOK PLACE IN

21  1992, '93, 1994, WE ARE HERE IN 1999.  HE IS A HECK

22  OF A WORKER.  YOU HEARD HIS BOSS COME IN AND PRAISE

23  HIM.

24          THE COURT:  I HAVE ALL THAT HISTORY.

25  PLEASE DON'T REPEAT THAT.  DO YOU WISH TO PRESENT

1   HIM?

2              MR. CANNON:  I WILL, JUDGE.

3              THE COURT:  HE HAS A RIGHT TO MAKE A

4   STATEMENT ON HIS OWN BEHALF.

5              MR. CANNON:  THANK YOU, YOUR HONOR.  MAY I

6   CALL MR. BOYD?

7              THE COURT:  YOU MAY.

8              THE CLERK:  STATE YOUR FULL NAME AND SPELL

9   YOUR LAST NAME FOR THE RECORD.

10             THE DEFENDANT:  JAMES L. BOYD, III.

11             JAMES L. BOYD, III, DEFENDANT, SWORN.

12  BY MR. CANNON:

13  Q.  MR. BOYD, A PRELIMINARY MATTER, DO YOU RECALL THE

14  COURT ASKING ME IF THE PRESENTENCE INVESTIGATION

15  REPORT THAT HAD BEEN PREPARED FOR YOU WAS ONE THAT WE

16  FOUND TO BE ACCURATE AND TO WHICH WE HAD NO

17  OBJECTIONS, DID YOU HEAR ME TELLING THE COURT THAT?

18  A.  YES.

19  Q.  YOU YOURSELF HAVE READ THE PRESENTENCE REPORT?

20  A.  YES.

21  Q.  DO YOU AGREE WITH MY STATEMENT TO THE COURT?

22  A.  YES.

23  Q.  OKAY.

24             NOW, THIS IS YOUR OPPORTUNITY TO ADDRESS

25  THE COURT AND TO TELL JUDGE NEWCOMER ANYTHING YOU

1  WOULD LIKE HIM TO KNOW BEFORE HE IMPOSES SENTENCE.

2  A.   JUDGE, I DON'T KNOW HOW TO START HERE.  I'M A

3  LITTLE NERVOUS.  I'M NOT REALLY ARTICULATE.  I STARTED

4  USING DRUGS WHEN I WAS TEN YEARS OLD.  THAT WAS THE

5  ONLY WAY I KNEW HOW TO LIVE, SO I GOT -- I GOT

6  INVOLVED IN A LOT OF THINGS THROUGHOUT THE 24 YEARS OF

7  MY DRUG USE.  I GOT INVOLVED WITH A LOT OF PEOPLE.

8  I'M NOT BLAMING ANYTHING ON ANYBODY.  I TAKE FULL

9  RESPONSIBILITY FOR EVERYTHING I DID.  I KNOW WHAT I

10  DID WAS WRONG.  I WAS -- I WAS -- I HAD GOTTEN OUT OF

11  THE -- OF THIS WHAT THIS WHOLE INCIDENT IS BASED ON, I

12  WAS OUT OF THIS FOR ABOUT TWO, TWO AND-A-HALF YEARS

13  BEFORE I WAS VISITED BY AULDT AND DOUG BROSE.  AGAIN

14  I'M NOT TRYING TO PUSH ANYTHING OFF.  I'M HERE TO

15  ACCEPT RESPONSIBILITY FOR WHAT I DID.  I HAD GOTTEN

16  MARRIED.  MY WIFE IS PREGNANT WITH MY SON, ALTHOUGH I

17  WAS STILL AN ACTIVE ADDICT.  AS YOUR HONOR KNOWS, I

18  HAVE BEEN AN ACTIVE ADDICT UP UNTIL TEN MONTHS AGO.

19  I'M TEN MONTHS CLEAN, THE 5TH OF JULY.

20         AGAIN, YOUR HONOR, I'M NOT HERE TO MAKE

21  EXCUSES.  I WORK HARD NOW, I WOULD -- I LIKE THE WAY

22  LIFE IS.  I DIDN'T KNOW HOW TO DEAL WITH LIFE BEFORE.

23  EVERYTHING WAS KILL THE PAIN WITH A BOTTLE, KILL THE

24  PAIN WITH A LINE OR WHATEVER IT WAS.  YOU KNOW, YOU

25  LEARN A LOT OF THINGS.  IF GIVEN THE OPPORTUNITY, THE

1   WAY I WAS GIVEN THE OPPORTUNITY AT MEREMONT, I WAS

2   GIVEN TOOLS, YOU KNOW, JUST TAUGHT HOW TO DEAL WITH

3   THINGS AND THAT'S THE WAY IT IS NOW.  I'M SURE YOU

4   HAVE HEARD IT ALL FROM EVERYBODY.  I'M NOT GOING TO

5   SIT HERE AND TELL YOU THE LIFE I LIVED WAS OVER LONG

6   BEFORE THIS, BEFORE THIS WHOLE TRIAL THING CAME TO

7   PLAY.

8           AGAIN, I HAVE BEEN MARRIED.  I HAVE A SON

9   ON THE WAY.  I WANT TO THANK YOUR HONOR, I WANT TO

10  THANK THE COURT FOR MY SOBRIETY.  OTHER THAN THAT, I

11  DON'T HAVE MUCH MORE TO SAY.  I'M AT YOUR MERCY.

12          THANK YOU, SIR.

13          THE COURT:  ANYTHING FURTHER YOU WISH TO

14  ADD?

15          MR. CANNON:  NO, YOUR HONOR.

16          THE COURT:  DO YOU HAVE ANY QUESTIONS?

17          MR. DOMINGUEZ:  NONE, YOUR HONOR.

18          THE COURT:  FINE.  THEN I'M GOING TO GO

19  DOWN THE LINE.  I WANT TO HEAR EVERYBODY BEFORE I

20  IMPOSE THE SENTENCES.

21          THANK YOU.

22          NEXT IS LAWRENCE MELLOT.

23          MR. HUFFMAN:  YES, YOUR HONOR.

24          THE COURT:  MR. HUFFMAN, YOU ARE

25  REPRESENTING MR. MELLOT.

1           MR. HUFFMAN:  YES, I AM.

2           THE COURT:  LET ME ASK YOU RIGHT AT THE

3    OUTSET, HAVE YOU HAD A FULL OPPORTUNITY TO READ THIS

4    PRESENTENCE REPORT CAREFULLY?

5           MR. HUFFMAN:  YES, I HAVE, YOUR HONOR.

6           THE COURT:  HAVE YOU DISCUSSED IT WITH YOUR

7    CLIENT IN FULL?

8           MR. HUFFMAN:  YES, I HAVE.

9           THE COURT:  HAS HE READ IT?

10          MR. HUFFMAN:  YES.

11          THE COURT:   DO YOU REPRESENT TO THE COURT

12   THAT HE FULLY UNDERSTANDS THE ENTIRE REPORT, TO THE

13   BEST OF YOUR KNOWLEDGE?

14          MR. HUFFMAN:  HE UNDERSTANDS IT.   HE

15   DISAGREES WITH SOME OF THE THINGS AT THE END THAT

16   HAPPENED, THAT IS ALLEGED TO HAVE HAPPENED THAT DIDN'T

17   HAPPEN.

18          THE COURT:  WELL --

19          MR. HUFFMAN:  IT'S VERY RELEVANT WHEN IT

20   COMES TO OUR PRESENTATION TO YOU, YOUR HONOR, THAT MR.

21   MELLOT HAS CHANGED AND --

22          THE COURT:  WELL, HE HAS CERTAIN OBJECTIONS

23   TO THE REPORT, IS THAT RIGHT?

24          MR. HUFFMAN:  YES, YOUR HONOR.

25          THE COURT:  VERY WELL.  WELL, WHY DON'T WE

1    TAKE UP THOSE OBJECTIONS NOW BEFORE WE GO ON.

2                YOU SAY THEY ARE IMPORTANT TO WHATEVER IT

3    IS THAT YOU WISH TO STATE TO THE COURT, IS THAT

4    RIGHT?

5                MR. HUFFMAN:  YES, YOUR HONOR.

6                THE COURT:  FIRST OF ALL, THE FIRST

7    OBJECTION TO THIS -- THE GOVERNMENT HAS NO OBJECTIONS,

8    I'M REFERRING TO THE REPORT.

9                MR. DOMINGUEZ:  THAT'S CORRECT, YOUR HONOR.

10               THE COURT:  ALL RIGHT.  BUT THE DEFENDANT

11   HAS SEVERAL.  THE FIRST OBJECTION IS THAT THE DEFENSE

12   COUNSEL OBJECTS TO PARAGRAPH 75, STATING THIS INCIDENT

13   IS, QUOTE, GROSSLY MISREPRESENTED.

14               THE DEFENSE CONTENDS THAT MISS FADDIS

15   MISREPRESENTED THE FACTS TO THE ASSAULT AGAINST HER

16   AND HER DAUGHTER TO THE POLICE TO INSURE THAT THE

17   POLICE WOULD TAKE ACTION TO THE DEFENDANT AND REMOVE

18   HIM FROM THE PREMISES.

19               THE PROBATION OFFICER RESPONDS TO THAT AND

20   STATES THAT THE INFORMATION THAT IS SET FORTH IN THE

21   REPORT IS ONLY THAT CONTAINED IN THE POLICE REPORT TO

22   WHICH THE DEFENDANT PLED GUILTY.

23               NOW, WHAT IS YOUR POSITION?

24               MR. HUFFMAN:  WELL, MISS FADDIS IS HERE TO

25   RESPOND.

1      THE COURT: I'M SORRY, A LITTLE LOUDER.

2      MR. HUFFMAN: MISS FADDIS IS HERE TO

3  RESPOND THAT IT WAS A DOMESTIC QUARREL AND THAT,

4  BASICALLY, RAY MELLOT HAS CHANGED FROM WHAT HE USED TO

5  BE AND THAT --

6      THE COURT: WELL, THAT MAY BE, BUT WE ARE

7  TALKING ABOUT WHETHER OR NOT THE REPORT IS CORRECT AND

8  ACCURATE IN WHAT IT SAYS.

9      MR. HUFFMAN: IT'S NOT QUITE ACCURATE, YOUR

10  HONOR.

11      THE COURT: WELL, I WILL TELL YOU WHAT.

12  I'M GOING TO READ WHAT THE REPORT SAYS AND THEN YOU

13  TELL ME WHAT IS INCORRECT ABOUT IT, WILL YOU, PLEASE,

14  BEARING IN MIND THAT THE PROBATION OFFICER GOT THIS

15  DIRECTLY FROM THE POLICE REPORT.

16      "ON MAY 4, 1998, POLICE WERE SUMMONED TO

17  548 LANCASTER AVENUE, LOT NUMBER 27 IN MALVERN,

18  PENNSYLVANIA AT THE HOME OF CAROL FADDIS. UPON

19  ARRIVAL, POLICE WERE MET OUT FRONT BY MISS FADDIS AND

20  TOLD THAT THE DEFENDANT HAD STRUCK HER IN THE FACE AND

21  KNOCKED HER TO THE GROUND. MISS FADDIS FURTHER

22  INFORMED POLICE THAT HE HAD ASSAULTED HER 14-YEAR OLD

23  DAUGHTER BY GRABBING HER AROUND THE THROAT WITH HIS

24  HANDS AND TACKLING HER TO THE FLOOR AND HAD TORN THE

25  JUVENILE'S SHIRT.

1        THE DEFENDANT INFORMED POLICE THAT HE HAD

2    BEEN ASSAULTED FIRST BY MISS FADDIS DURING THE COURSE

3    OF THEIR ARGUMENT.

4        POLICE DID OBSERVE A NOTICEABLE INJURY TO

5    THE LEFT SIDE OF HIS FACE."

6        THAT'S IT.

7        MR. HUFFMAN:  YES, YOUR HONOR.  WHAT IS

8    TRUE IS THAT HE WAS ATTACKED BY MISS FADDIS BUT IN

9    ORDER TO COVER HERSELF, MISS FADDIS ALLEGED ASSAULT

10   AGAINST HIM.

11       THE COURT:  BUT HE PLED GUILTY TO IT,

12   DIDN'T HE?

13       MR. HUFFMAN:  YES, YOUR HONOR.

14       THE COURT:  HE WAS CHARGED WITH SIMPLE

15   ASSAULT, DISORDERLY CONDUCT AND HARASSMENT AND

16   STALKING ON JUNE 1, 1998 AT WHICH TIME I BELIEVE HE

17   WAS 33 YEARS OF AGE.  HE WAS ORDERED TO PAY A FINE OF

18   $101.50.  HE PAID THAT IN FULL ON NOVEMBER 2, 1998.

19   THE OTHER CHARGES WERE WITHDRAWN BY THE VICTIM, IT

20   SAYS.

21       MR. HUFFMAN:  YOUR HONOR, MR. MELLOT ONLY

22   PLED GUILTY TO DISORDERLY CONDUCT.

23       THE COURT:  THE OTHER CHARGES WERE --

24   THAT'S NOT WHAT IT SAYS HERE.  IT SAYS, HE PLED GUILTY

25   TO THE CHARGE OF HARASSMENT AND STALKING.  THAT'S WHAT

1   THE POLICE REPORT SAYS, ACCORDING TO THIS REPORT.

2         NOW, IF YOU HAVE SOME OTHER EVIDENCE TO

3   OVERCOME THIS, SUCH AS A CERTIFIED COPY OF A POLICE

4   REPORT OR SOMETHING OF THAT KIND, I WOULD BE VERY GLAD

5   TO LOOK AT IT.

6         IN THE ABSENCE OF THAT, I'M GOING TO HAVE

7   TO COME DOWN ON THE SIDE OF THE PROBATION OFFICER THAT

8   THIS IS SIMPLY TAKEN FROM THE POLICE REPORT AND IS

9   CORRECT.

10        DO YOU WISH TO CALL ANY WITNESS ON THIS

11   POINT? YOU KNOW, NO CRIMINAL HISTORY POINTS WERE

12   AWARDED FOR THIS, YOU ARE AWARE OF THAT?

13        MR. HUFFMAN: NO, YOUR HONOR, I THINK --

14        THE COURT: WELL, THAT'S THE CASE. CAN WE

15   MOVE ALONG TO THE SECOND OBJECTION?

16        MR. HUFFMAN: YES, YOUR HONOR.

17        THE COURT: OBJECTION TWO, DEFENSE OBJECTS

18   TO PARAGRAPH 84 STATING THAT THE INCIDENT IS QUOTE

19   GROSSLY MISREPRESENTED. ACCORDING TO DEFENSE COUNSEL,

20   DEFENDANT AND MR. OSBORNE HAD A DISPUTE ON OCTOBER

21   15TH, 1998, THAT MR. OSBORNE FALSELY REPRESENTED THE

22   POLICE THAT A RIFLE IN HIS HOME BELONGED TO MR.

23   MELLOT, KNOWING THAT THIS WOULD GREATLY INCREASE THE

24   CHANCES OF HAVING THE DEFENDANT REMOVED FROM HIS HOME

25   BY POLICE.

1       DEFENSE COUNSEL CONTENDS THAT THE GUN

2   ACTUALLY BELONGED TO A BRIAN FARR AND WAS GIVEN TO MR.

3   OSBORNE AS COLLATERAL FOR BAIL MONEY PROVIDED TO MR.

4   FARR BY MR. OSBORNE.

5       THE PROBATION OFFICER RESPONDS TO THAT AND

6   STATES THAT THIS INFORMATION IS THAT WHICH WAS TAKEN

7   FROM AN OFFICIAL POLICE INVESTIGATION REPORT OF THE

8   ABOVE-MENTIONED INCIDENT.

9       THE PROBATION OFFICE HAS NO INFORMATION TO

10  REFUTE THIS OFFICIAL VERSION OF THE INCIDENT.

11      DO YOU?

12      MR. HUFFMAN:  I BELIEVE MR. OSBORNE WROTE A

13  LETTER TO THAT EFFECT.  SAID IT WAS NOT -- IT WAS NOT

14  MR. MELLOT'S GUN, AND IT WAS NEVER SHOWN TO BE MR.

15  MELLOT'S GUN.  THE POLICE REPORT -- THE POLICE NEVER

16  FOUND IT TO BE MR. MELLOT'S GUN.

17      THE COURT:  HE WROTE A LETTER TO WHOM?  TO

18  ME?

19      MR. HUFFMAN:  HE ADDRESSED IT TO THE

20  PROBATION DEPARTMENT, I BELIEVE.

21      THE COURT:  WELL, I DON'T HAVE ANY SUCH

22  LETTER.  DOES THE PROBATION DEPARTMENT?  DO YOU HAVE

23  SUCH A LETTER?

24      PROBATION OFFICER:  I MIGHT, YOUR HONOR,

25  BUT IT MIGHT TAKE ME A LITTLE WHILE TO FIND IT.

1       MR. DOMINGUEZ:  YOUR HONOR, I WOULD JUST
2   NOTE AGAIN, THERE ARE NO CRIMINAL HISTORY POINTS
3   ATTACHED TO THIS.  IT DOES NOT AFFECT THIS DEFENDANT.
4       THE COURT:  THAT'S TRUE.  THEREFORE, THIS
5   IS NOT IN ANY WAY FIGURING INTO THE BRACKET IN WHICH
6   HE IS PLACED UNDER THE GUIDELINES.
7       MR. DOMINGUEZ:  PERHAPS IN LIGHT OF --
8       THE COURT:  IT IS SOMETHING THAT THE REPORT
9   STATES HAPPENED BASED UPON A POLICE REPORT.  IF YOU
10  HAVE ANY EVIDENCE THAT WOULD BE APPROPRIATE HERE, I
11  WOULD BE GLAD TO ENTERTAIN IT.  SHORT OF THAT, I'M
12  GOING TO HAVE TO OVERRULE THE OBJECTION.
13      MR. HUFFMAN:  YOUR HONOR, THE ONLY THING I
14  CAN DO AS FAR AS WHAT I'M TRYING TO -- I KNOW THESE
15  THINGS HAVE NO EFFECT AS FAR AS POINTS BUT THE FACT
16  THAT THEY -- IT APPEARS THAT THESE THINGS HAPPENED TO
17  THE EXTENT THAT THEY HAPPENED, IT APPEARS THAT IT
18  WOULD LOOK LIKE MR. MELLOT HAS NOT CHANGED TO THE
19  EXTENT THAT HE HAS.
20      THE COURT:  WELL, AS I SAY, IF YOU HAVE ANY
21  EVIDENCE YOU WANT TO PRESENT, PLEASE DO IT NOW.
22      MR. HUFFMAN:  OKAY.
23      I WOULD LIKE TO PRESENT MR. MELLOT'S
24  SISTER.
25      THE COURT:  VERY WELL.  HAVE HER COME

1    FORWARD, PLEASE.

2            MR. DOMINGUEZ:  IS IT ALL RIGHT IF MR.

3    HUFFMAN STAYS AT THE TABLE?

4            THE COURT:  WHEREVER HE PREFERS.

5            COME FORWARD, PLEASE, TO THE LECTERN BUT,

6    COUNSEL, YOU MAY STAY BACK THERE IF YOU WOULD LIKE.

7            THE CLERK:  STATE AND SPELL YOUR FULL NAME

8    FOR THE RECORD.

9            THE WITNESS:  JANE REID, R-E-I-D, JANE,

10   J-A-N-E.

11           JANE REID, DEFENSE WITNESS, SWORN.

12               DIRECT EXAMINATION

13   BY MR. HUFFMAN:

14   Q.   JANE, WHERE DO YOU LIVE?

15   A.   I LIVE IN CONAWINGO (PH), MARYLAND.

16   Q.   AND HOW LONG HAVE YOU KNOWN THE DEFENDANT?

17   A.   ALL MY LIFE.

18   Q.   WHAT RELATIONSHIP ARE YOU TO THE DEFENDANT?

19   A.   I'M HIS SISTER.

20   Q.   HAVE YOU NOTED ANY CHANGES IN THE DEFENDANT IN

21   RECENT YEARS?

22   A.   YES, I HAVE, IN THE LAST YEAR, TWO YEARS.

23   Q.   MA'AM, WHAT CHANGE DID YOU NOTE?

24   A.   HE IS TRYING TO STRAIGHTEN HIS LIFE OUT, GET HIS

25   LIFE TOGETHER FOR ONCE IN HIS LIFETIME.  HE HAS GOT

1    CUSTODY OF BOTH OF HIS DAUGHTERS, WHICH HE IS RAISING

2    ON HIS OWN RIGHT NOW.

3    Q.    AND WHAT ARE HIS DAUGHTERS' NAMES AND AGES?

4    A.    TIFFANY MELLOT.  I THINK -- I DON'T KNOW HOW OLD

5    SHE IS AND I THINK SUZANNE MELLOT, SHE IS 12.

6    Q.    AND DO EITHER OF THE CHILDREN HAVE A DISABILITY?

7    A.    SUZANNE IS LEGALLY BLIND.

8    Q.    AND WHAT HAS HE DONE TO CHANGE, TO HELP SUSIE,

9    SUZANNE?

10   A.    THEY HAVE A MORE STABLE LIFE.  THEY ARE IN A

11   SCHOOL.  THEY HAVE BEEN IN SCHOOL.  THEIR GRADES HAVE

12   COME UP.  THE TEACHERS HAVE VERY GOOD THINGS TO SAY

13   ABOUT THEM.

14   Q.    WHAT WERE THEIR GRADES BEFORE HE HAD CUSTODY?

15   A.    THEY WERE NOT VERY GOOD.  THEY WERE IN AND OUT OF

16   SCHOOL.  THEY WERE DRUG FROM HERE AND THERE.  HE HAS

17   ATTENDED THE MEETINGS AT SCHOOL FOR HIS CHILDREN.

18   BOTH OF THEM ARE VERY HAPPY.  BOTH OF THEM HAVE TOLD

19   ME THAT THEY HAVE THE NICEST HOME THEY HAVE EVER HAD

20   IN THEIR LIFETIME RIGHT NOW WITH THEIR FATHER.

21   Q.    AND WHERE DOES HE LIVE CURRENTLY WITH THE

22   CHILDREN?

23   A.    MY PARENTS HAVE A TRAILER PARK IN KIRKWOOD,

24   PENNSYLVANIA.  HE HAS RENTED A TRAILER FROM THEM.

25   THEY ARE RIGHT UP THE.  LIKE THE LANE FROM HIM.  AND

1    HE HAS A STABLE HOME.  THEY ARE IN A STABLE SCHOOL

2    DISTRICT.  THEY GET TO SEE THEIR GRANDPARENTS.  THERE

3    ARE CHILDREN THERE TO PLAY WITH.

4    Q.    DO YOU NOTICE ANY CHANGE IN THE CHILDREN?

5    A.    YES, I DO.

6    Q.    ARE YOU AWARE OF HOW LONG MR. MELLOT HAD FULL

7    CUSTODY OF THE CHILDREN?

8    A.    I BELIEVE IT HAS BEEN A YEAR.  EIGHT MONTHS TO A

9    YEAR.  I'M NOT RIGHTLY SURE.

10   Q.    AND HAVE YOU NOTICED WHAT HAS HAPPENED TO THEIR

11   GRADES SINCE THE CHILDREN HAVE BEEN WITH MR. MELLOT?

12   A.    THEY HAVE IMPROVED ECSTATICALLY.  THEIR WHOLE

13   LIFE HAS BEEN A LOT BETTER THAN WHAT IT HAS BEEN.

14   Q.    HAVE YOU NOTICED ANY CHANGE IN THE CHILDREN'S

15   SELF ESTEEM?

16   A.    THEY ARE MORE -- THEY ARE HAPPIER, THEY FEEL

17   LOVED.  THEY KNOW THAT THEY ARE LOVED.

18   Q.    ARE YOU AWARE OF ANY OF THE PREVIOUS HISTORY OF

19   THE CHILDREN BEFORE?

20   A.    I'M WELL AWARE OF IT.

21   Q.    COULD YOU TELL THE HONORABLE JUDGE NEWCOMER WHAT

22   THE HISTORY WAS OF THE CHILDREN BEFORE MR. MELLOT GAVE

23   THEM STABILITY?

24   A.    THEY WERE NOT IN A VERY GOOD ENVIRONMENT.  NOT A

25   STABLE ENVIRONMENT.  THEIR MOTHER DOES NOT WORK.  SHE

1    HAS LIVED HERE AND THERE, DRAGS HER CHILDREN FROM

2    PLACE TO PLACE.  SUZANNE, THE ONE THAT IS LEGALLY

3    BLIND, IS SUPPOSED TO GO TO A SCHOOL FOR THE BLIND TO

4    LEARN TO DEAL WITH THE BLINDNESS.  SHE ATTENDED IT

5    MAYBE THREE OR FOUR TIMES.  THE MOTHER HAS NOT LEFT

6    HER ATTEND THAT.  I HAD TAKEN THE MOTHER A COUPLE OF

7    TIMES TO THE DOCTORS WHEN SHE WAS VERY YOUNG AS A BABY

8    FOR HER BLINDNESS.  THE MOTHER DID NOT FOLLOW UP ON

9    THE TREATMENTS.  I WOULD ASK QUESTIONS, I WAS NOT

10   ALLOWED TO BE TOLD THOSE TREATMENTS.

11            THE MOTHER ALSO WILL NOT LET HER IN CONTACT

12   WITH LAWRENCE'S FAMILY.  WHEN HE DOES NOT HAVE THEM IN

13   HIS CUSTODY, WE ARE NOT ALLOWED TO SEE THEM.

14   Q.   ARE YOU AWARE OF ANY HISTORY OF PROBLEMS WITH

15   LICE?

16   A.   WELL AWARE OF IT.  EVERY TIME THEY GO TO THEIR

17   MOTHER'S HOUSE THEY COME HOME WITH LICE AND MY BROTHER

18   HAS TO TREAT THEM FOR HEAD LICE.  THEY ARE NOT AROUND

19   THE OTHER CHILDREN IN THE TRAILER PARK BECAUSE --

20   UNTIL THEY ARE TREATED BECAUSE THEY BRING THE THINGS

21   HOME.  THEIR MOTHER DOES NOT HAVE A HOME TO PROVIDE

22   THEM WITH, AS OF RIGHT NOW.  MY NIECE TOLD ME THAT

23   THEIR MOTHER WAS LIVING IN A ONE BEDROOM HOME AND ALL

24   FIVE OF THEM SLEEP IN THE SAME ROOM.

25   Q.   IN YOUR OPINION, WHAT WOULD BE THE REACTION OR

1   HARDSHIP ON THE CHILDREN IF THEIR FATHER IS NOT ABLE

2   TO BE THERE WITH THEM?

3   A.   I DON'T SEE THAT THEIR LIFE WOULD HEAD TO ANY

4   GOOD IF THEY GO BACK TO THEIR MOTHER.  I BELIEVE THAT

5   IT WOULD EITHER LEAD THEM TO CRIME OR THAT THEY WILL

6   BE ON THE STREET OR PREGNANT BEFORE THE AGE OF 18.

7   THERE IS NO GUIDELINES THERE THAT SHE FOLLOWS OR GOES

8   BY.  I KNOW THAT THEY WILL BE YANKED FROM SCHOOL TO

9   SCHOOL, THEY WON'T HAVE AN EDUCATION LIKE THEY DESERVE

10  TO HAVE.  THEY WON'T FEEL THE LOVE THAT THEY NEED TO

11  HAVE.  I FEEL IT WOULD BE AN ABUSIVE SITUATION.

12  Q.   WHAT HAPPENS IF THE -- WHAT HAS THEIR FATHER,

13  LAWRENCE MELLOT, BEEN DOING TO GIVE THEM ALL THAT?

14  A.   HE HAS --

15  Q.   TO SUM IT UP.

16  A.   HE HAS PROVIDED THEM WITH A STABLE HOME.  THEY

17  ARE LOVED VERY MUCH.  THEY HAVE -- THEY HAVE FOOD IN

18  THEIR HOME, THEY HAVE CLOTHING THAT THEY NEED.  THEY

19  GO TO SCHOOL EVERYDAY.  THEY HAVE NOT MISSED SCHOOL.

20  HE HELPS THEM WITH THEIR HOMEWORK.  HE GOES TO THE

21  SCHOOL AND MEETINGS WITH THEIR TEACHERS AND TALKS TO

22  THEM.  THEY WENT TO CHURCH WITH ME A COUPLE OF TIMES

23  AND THEY HAVE THE NEED TO LEARN ABOUT GOD AND ABOUT

24  LIFE, THE WAY IT SHOULD BE.

25  Q.   AND HOW HAS LAWRENCE MELLOT, YOUR BROTHER,

1   CHANGED AS A PERSON, OTHER THAN JUST THE CHILDREN, IN

2   YOUR OPINION?

3   A.   HE HAS BECAME MORE RESPONSIBLE.  HE HAS HIS --

4   LIKE I SAID, HIS CHILDREN, HE HAS A STABLE HOME NOW.

5   HE IS PAYING RENT.  HE HOLDS DOWN -- YOU KNOW,

6   WHATEVER MY PARENTS NEED DONE AROUND THE HOME THERE.

7   HE TRIES TO HELP THEM TO THE BEST HE CAN.  HE DOES

8   HAVE A DISABILITY SO --

9   Q.   WHAT IS HIS DISABILITY, DOES HE ATTEMPT TO WORK?

10  A.   YES.  HE WILL DO -- I MEAN, HE DOES NOT LET

11  ANYTHING BRING HIM DOWN.  HE IS JUST A GO-GETTER.  HE

12  WILL DO EVERYTHING HE CAN DO.

13  Q.   WHAT IS THAT DISABILITY?

14  A.   HE HAS A PROSTHESIS LEG.

15           MR. HUFFMAN:  I DON'T HAVE ANY FURTHER

16  QUESTIONS.

17           ANY QUESTIONS, COUNSEL?

18           MR. DOMINGUEZ:  NO, I DO NOT.  THANK YOU,

19  MA'AM.

20           MR. HUFFMAN:  I WOULD LIKE TO CALL CAROL

21  FADDIS.

22           THE CLERK:  STATE AND SPELL YOUR NAME FOR

23  THE RECORD.

24           THE WITNESS:  CAROL MARIE FADDIS,

25  F-A-D-D-I-S.

1                    CAROL MARIE FADDIS, DEFENSE WITNESS, SWORN.

2                         DIRECT EXAMINATION

3     BY MR. HUFFMAN:

4     Q.    CAROL, HOW LONG HAVE YOU KNOWN THE DEFENDANT?

5     A.    GOING ON TEN YEARS.

6     Q.    WHAT IS YOUR RELATIONSHIP TO THE DEFENDANT?

7     A.    BOYFRIEND AND GIRLFRIEND.

8     Q.    HAVE YOU SEEN ANY CHANGES IN LAWRENCE MELLOT IN

9     THE PAST YEAR OR TWO?

10    A.    YES, I HAVE.

11    Q.    WHAT ARE THOSE CHANGES?

12    A.    HIS LIFE-STYLE IS NOT WILD ANYMORE, CRAZY.  HIS

13    KIDS ARE A VERY IMPORTANT PART OF HIS LIFE.  WORKS,

14    TAKES CARE OF HIS FAMILY.

15    Q.    DOES HE LIVE WITH YOU RIGHT NOW?

16    A.    NO, HE DOES NOT.

17    Q.    DOES HIM LIVING WITH HIS CHILDREN RIGHT NOW HAVE

18    ANY -- NOT LIVING WITH YOU HAVE ANYTHING TO DO WITH

19    HIS CHILDREN?

20    A.    I DON'T UNDERSTAND THE QUESTION.

21    Q.    DOES HIM LIVING WITH YOU, NOT LIVING WITH YOU,

22    HAVE ANYTHING TO DO WITH HIS CHILDREN, WHAT HE WANTS

23    TO DO WITH HIS CHILDREN?

24    A.    NO.  HE TAKES VERY GOOD CARE OF HIS CHILDREN.

25    Q.    I UNDERSTAND THAT.

1          WAS THERE ANY CONVERSATION BETWEEN YOU AND

2     MR. MELLOT THAT HE COULD TAKE BETTER CARE OF THE

3     CHILDREN IF HE LIVED BY HIMSELF AND JUST CONCENTRATED

4     ON THE CHILDREN?

5     A.    THE CONVERSATION WAS BECAUSE I LIVE IN A 14 BY 70

6     MOBILE HOME.  THE CONDITIONS WERE NOT IN THE BEST

7     INTEREST OF THE CHILDREN.

8     Q.    AND BECAUSE YOU ALSO HAD YOUR CHILDREN AND IT WAS

9     CROWDED?

10    A.    RIGHT.

11    Q.    IS THAT FAIR TO SAY?

12    A.    YES.

13    Q.    AND HE WANTED TO -- BETTER FOR THE CHILDREN?

14    A.    HE WANTED THEM TO HAVE THEIR OWN ROOMS, THEIR OWN

15    BEDS.

16    Q.    HE WANTS THEM TO HAVE SOMETHING THEY COULD SAY

17    WAS THEIRS?

18    A.    RIGHT.

19    Q.    AS FAR AS MR. MELLOT'S ATTITUDE TOWARDS LIFE,

20    HAVE YOU SEEN ANY CHANGES THAT COULD HELP THE COURT?

21    A.    RAY WOULD LIKE -- RAY IS DOING EVERYTHING HE CAN

22    TO CHANGE HIS LIFE AROUND SINCE HE HAS BEEN OUT OF THE

23    CLUB.

24    Q.    DO YOU HAVE ANY KNOWLEDGE ABOUT HOW MR. MELLOT

25    STOPPED BEING PART OF THE CLUB?

1   A.   HOW HE GOT OUT?

2   Q.   YES.

3   A.   HE TOOK A VERY BAD BEATING, I KNOW THAT.  I DON'T

4   KNOW MUCH ABOUT THE CLUB SO I KNOW HE WANTED -- HE

5   DIDN'T WANT TO BE INVOLVED IN THAT LIFE.  HE WANTED

6   HIS KIDS, HE WANTED A FAMILY.

7   Q.   DID IT HAVE ANYTHING TO DO WITH HIS WANTING TO

8   LIVE A FAMILY LIFE OTHER THAN BEING INVOLVED IN THAT

9   GROUP?

10  A.   YEAH, HE WANTED TO BE A FATHER TO HIS KIDS.  HE

11  WANTED TO LIVE A NORMAL LIFE.  HE DID NOT WANT TO LIVE

12  THAT KIND OF LIFE-STYLE ANYMORE.

13  Q.   HOW LONG WAS HE -- I GUESS I WILL HAVE TO ASK

14  HIM.  DO YOU HAVE ANY KNOWLEDGE OF HOW LONG HE TOLD

15  YOU HE WAS AN ACTUAL MEMBER OF THE CLUB?

16  A.   I WOULD HAVE TO SAY SIX MONTHS, MAYBE A YEAR AT

17  THE MOST.

18  Q.   AND WHEN DID HE ACTUALLY TOTALLY DROP OUT OF THE

19  CLUB?

20  A.   IT HAS BEEN YEARS.  I DON'T REMEMBER EXACTLY

21  WHEN.  IT HAS BEEN A FEW YEARS.

22          MR. HUFFMAN:  I DON'T HAVE ANY FURTHER

23  QUESTIONS.

24          THE COURT:  COUNSEL.

25          MR. DOMINGUEZ:  YOUR HONOR, I JUST HAVE A

1    COUPLE OF QUESTIONS.

2              I NOTE THAT ONE OF THE OBJECTIONS IN THIS

3    CASE WAS PARAGRAPH 75, AND IT APPEARS FROM THE RECORD

4    THAT IS PARAGRAPH 75, THAT MISS FADDIS WAS THE

5    INDIVIDUAL THAT CONTACTED THE POLICE.

6                        CROSS-EXAMINATION

7    BY MR. DOMINGUEZ:

8    Q.   IS THAT CORRECT, MISS FADDIS?

9    A.   YES.

10   Q.   DID YOU ACCURATELY AND TRUTHFULLY REPORT TO THE

11   POLICE THAT THE DEFENDANT STRUCK YOU IN THE FACE AND

12   KNOCKED YOU TO THE GROUND?

13   A.   THAT'S WHAT I TOLD THEM AT THE TIME.

14   Q.   WAS THAT THE TRUTH WHEN YOU TOLD THEM THAT OR

15   WERE YOU LYING?

16   A.   I FABRICATED A LITTLE BIT.

17   Q.   WERE YOU ALSO FABRICATING IT WHEN YOU SAID THAT

18   HE ASSAULTED YOUR 14-YEAR OLD DAUGHTER, GRABBING HER

19   AROUND THE THROAT WITH HIS HANDS AND TAKING HER TO THE

20   GROUND?

21   A.   YES.

22   Q.   THAT WAS COMPLETE FABRICATION?

23   A.   YES.

24   Q.   WHY DID YOU CALL THE POLICE TO FABRICATE THIS

25   AGAINST THIS DEFENDANT?

1    A.    BECAUSE WE WERE ARGUING AND I HAD HIT HIM IN THE

2    FACE AND I THOUGHT HE WAS GOING TO COME AFTER ME.    MY

3    14-YEAR OLD DAUGHTER PICKED UP A LEAD PIPE AND STARTED

4    SMASHING HIS MOTORCYCLE APART.

5    Q.    DID THE DEFENDANT GRAB HER AT THAT TIME?

6    A.    NO.    I GOT IN BETWEEN THE BIKE AND HER SO SHE

7    WOULD NOT HIT IT ANYMORE.

8    Q.    DID YOU ALSO RIP YOUR DAUGHTER'S SHIRT?

9    A.    THE SHIRT WAS NOT RIPPED.

10   Q.    THAT WAS A FABRICATION, TOO?

11   A.    HER SHIRT WAS NOT RIPPED.

12   Q.    DID -- IT IS ALLEGED IN THE REPORT THAT YOU TOLD

13   THE POLICE THAT SHE HAD HER SHIRT RIPPED BY THE

14   DEFENDANT AFTER HE GRABBED HER BY THE THROAT.

15   A.    I NEVER TOLD THE POLICE THAT.    SHE MAY HAVE, BUT

16   I NEVER DID.

17   Q.    OKAY.

18         BUT THAT WAS NOT TRUE EITHER?

19   A.    NO.

20         MR. DOMINGUEZ:    VERY WELL.

21         YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

22   HOWEVER, IN LIGHT OF THE REPORT BY THIS INDIVIDUAL,

23   HER TESTIMONY WOULD APPEAR TO CONTRADICT WHAT IT IS --

24   WHAT IS IN PARAGRAPH 75.    WE WOULD ASK THAT THE COURT

25   STRIKE THAT REFERENCE FROM ITS CONSIDERATION OF THE

1    APPROPRIATE SENTENCE IN THIS CASE IN LIGHT OF THE FACT

2    THAT THE COMPLAINANT HAS HERE UNDER OATH TESTIFIED

3    THAT SHE FABRICATED THE INFORMATION SHE TOLD THE

4    POLICE.  AS THE COURT ALREADY NOTED THERE IS NO

5    CRIMINAL HISTORY POINTS ATTACHED TO IT, SO I'M NOT

6    SURE WHAT SIGNIFICANCE IT MIGHT HAVE TO THE COURT, BUT

7    IN LIGHT OF WHAT THE RECORD IS, AS WE STAND HERE

8    TODAY, WE WOULD ASK THAT THE COURT NOT CONSIDER WHAT

9    IS SET FORTH IN PARAGRAPH 75.

10            THE COURT:  WELL, SINCE IT IS A MATTER OF

11   IT'S CONTAINED IN THE POLICE REPORT, I'M GOING TO LET

12   IT STAND BECAUSE THERE IS THE ISSUE OF CREDIBILITY AS

13   TO THIS PARTICULAR WITNESS BEFORE ME RIGHT NOW.  I

14   WILL, HOWEVER, DECLARE THAT I SHALL NOT TAKE THE FACTS

15   SET FORTH IN THAT PARAGRAPH INTO CONSIDERATION IN ANY

16   WAY IN IMPOSING SENTENCE.  YOU MAY STEP DOWN.

17            MR. DOMINGUEZ:  THANK YOU, YOUR HONOR.

18            THE COURT:  ANYTHING ELSE, SIR?

19            MR. HUFFMAN:  I WOULD LIKE TO SPEAK ON

20   BEHALF OF THE CLIENT.

21            THE COURT:  VERY WELL.

22            THE COURT:  BEFORE HE COMES UP TO SPEAK FOR

23   HIMSELF, YOUR HONOR.

24            I HAVE SEEN THE PRESENTENCE REPORT AND THE

25   REPORT OF THE PROSECUTION, AND I NOTICED THAT THERE

1  ARE, IN THE REPORT, A CRIMINAL HISTORY, BUT I WOULD

2  LIKE TO POINT OUT TO THE COURT THAT IT IS HEAVILY

3  WEIGHTED IN THE JUVENILE AREA AND ALSO WHEN HE WAS 18,

4  19 YEARS OLD, AND THAT HIS ADULT HISTORY WAS MOSTLY

5  MARIJUANA POSSESSION, THERE WAS A COUPLE OF THEM, AND

6  TRAFFIC VIOLATIONS, DRIVING WITH SUSPENDED LICENSE.

7          SO THAT'S THE FIRST THING THAT I WANT TO

8  POINT OUT.

9          THE COURT:  I HAVE READ THAT, SO I'M AWARE

10  OF THAT.  THANK YOU.

11          MR. HUFFMAN:  THE SECOND THING I WOULD LIKE

12  TO POINT OUT IS THE LIMITATION OF MR. MELLOT'S

13  CULPABILITY, THAT HE WAS NOT INVOLVED IN THE COCAINE

14  DISTRIBUTION.  HE WAS NOT INVOLVED WITH THE AMISH

15  SITUATION.  HE WAS INVOLVED IN THE METHAMPHETAMINE

16  DISTRIBUTION IN CHESTER COUNTY BARS.

17          NOW, OUT OF THE FIVE YEARS TIME, HIS

18  INVOLVEMENT WAS OVER A YEAR, SO HE WAS NOT A MAJOR

19  PART OF THE CONSPIRACY.  IN FACT, SINCE HE WAS, AS IS

20  DEFINED BY THE PROSECUTION AND ALSO THE SENTENCE

21  REPORT, A WANNA-BE, BECAUSE DURING THE TIME HE WAS

22  DOING THIS, HE WAS A WANNA-BE, HE WAS NOT A PAGAN

23  WHICH MEANS, BASICALLY, THEY DID NOT GIVE HIM ANY

24  INFORMATION ABOUT WHAT WAS GOING ON.

25          BY THE TIME HE BECAME A PAGAN, HE HAD

1    STOPPED ON HIS OWN AND HE WAS ONLY A PAGAN FOR A SHORT

2    PERIOD OF TIME, A MATTER OF MONTHS.  I THINK IT'S LESS

3    TIME THAN WHAT CAROL ACTUALLY REMEMBERS.  BUT THAT

4    TIME THAT HE WAS A PAGAN, HE BASICALLY TOLD THEM THAT

5    HE WANTED OUT OF THE CLUB BECAUSE HE DID NOT WANT THAT

6    LIFE-STYLE, PUT HIS HANDS BEHIND HIS BACK AND TOOK A

7    BEATING SO HE COULD BE A FAMILY MAN.  AND HE HAS BEEN

8    TRYING TO BE A FAMILY MAN SINCE.

9            WITH RETROSPECT TO, YOU KNOW, SOME OF THE

10   OTHER ISSUES, HE DID STOP COMPLETELY SELLING MUCH

11   BEFORE THE INVESTIGATION STARTED.  IN FACT, HE WAS IN

12   A MOTORCYCLE ACCIDENT.  HIS YEARS STARTED IN '84, THE

13   PRESENTENCE REPORT ACTUALLY SAYS HE STOPPED IN '96,

14   ACTUALLY IT WAS '95, WHERE HE EVENTUALLY STOPPED.  HE

15   DIDN'T DO MUCH OF IT AFTER HIS CAR ACCIDENT.

16           AND YOUR HONOR, AS FAR AS HIS ACTIVITIES

17   ARE CONCERNED, THIS CAR ACCIDENT, THE SEVERITY OF IT,

18   THE MULTIPLE OPERATIONS THAT HE WAS THROUGH, THE PAIN

19   THAT HE HAD TO GO THROUGH, WHICH EVENTUALLY RESULTED

20   IN THE REMOVAL OF HIS LEG, WAS A RUDE AWAKENING FOR

21   HIM.  HE BEGAN TO SEE HIS CHILDREN AND WAS DEEPLY

22   CONCERNED ABOUT THEIR LIFE AND WHAT HE COULD DO TO

23   HELP THEM.  MR. MELLOT HAS CHANGED.  HE IS CONCERNED

24   ABOUT SOME INFORMATION THAT IS IN THERE THAT IS FAR

25   FROM BEING ACCURATE THAT --

1          THE COURT:  NO.  NO, BECAUSE I HAVE GIVEN

2   YOU AN OPPORTUNITY TO TAKE ANY OBJECTIONS TO THE

3   FINDING OF THIS REPORT THAT YOU WANT.  I HAVE NOT

4   HEARD THAT BEFORE.

5          MR. HUFFMAN:  YOUR HONOR, I'M TALKING ABOUT

6   THE LATER INCIDENT, SAYING THAT HE HAD THREATENED HIS

7   -- THE FORMER -- THE MOTHER OF HIS CHILDREN WHICH IS

8   LATER IN THE REPORT THAT -- THERE ARE ALLEGATIONS THAT

9   HAVE NOT BEEN PROVEN, AND HE IS HERE ON HIS OWN

10  DEFENSE TO SAY TO YOU, YOUR HONOR, AND EXPLAIN

11  ANYTHING THAT HE WANTS TO EXPLAIN TO YOU ABOUT --

12         THE COURT:  WELL, WHY DON'T YOU CALL HIM.

13         MR. HUFFMAN:  -- ABOUT THOSE SITUATIONS.

14         MR. MELLOT.

15         THE COURT:  YOU HAVE A RIGHT TO MAKE A

16  STATEMENT ON YOUR OWN BEHALF, IF YOU WISH TO DO SO.

17         THE CLERK:  STATE AND SPELL YOUR NAME FOR

18  THE RECORD.

19         THE DEFENDANT:  LAWRENCE MELLOT.

20         LAWRENCE MELLOT, DEFENDANT, SWORN.

21         THE COURT:  PROCEED.

22              DIRECT EXAMINATION

23  BY MR. HUFFMAN:

24  Q.   MR. MELLOT, WHERE DO YOU LIVE RIGHT NOW?

25  A.   KIRKWOOD, PENNSYLVANIA.

1    Q.    AND WHO DO YOU LIVE WITH?

2    A.    MY TWO DAUGHTERS.

3    Q.    AND WHY DO YOU LIVE -- I MEAN, HOW DID YOU COME

4    ABOUT HAVING CUSTODY OF YOUR TWO DAUGHTERS?

5             THE COURT:  COUNSEL, THIS INFORMATION IS

6    COVERED IN THE REPORT.  WHY DON'T YOU ASK HIM WHAT HE

7    WANTS TO TELL THE COURT?  HE HAS BEEN CALLED TO MAKE A

8    STATEMENT ON HIS OWN BEHALF AND THIS IS HIS

9    OPPORTUNITY.

10   BY MR. HUFFMAN:

11   Q.   WHAT WOULD YOU LIKE TO TELL THE COURT ON YOUR OWN

12   BEHALF?

13   A.    YOUR HONOR, I DON'T KNOW HAVE MUCH TO SAY ABOUT

14   MY MISTAKES IN THE PAST.

15             THE COURT:  I'M SORRY I DID NOT GET ALL

16   THAT.

17             THE DEFENDANT:  I DON'T HAVE TOO MUCH TO

18   SAY ABOUT MY MISTAKES IN THE PAST.  I REALIZE THAT

19   THERE WERE MISTAKES.

20   Q.   YOU REALIZE WHAT?

21   A.    I REALIZE THAT THEY ARE SOME PRETTY BIG MISTAKES

22   THAT I HAVE MADE.  MY MAIN CONCERN TODAY IS MY

23   CHILDREN.  WHEN THE COURT HANDS DOWN MY SENTENCE, I

24   WOULD LIKE HIM TO TAKE INTO CONSIDERATION TO GIVE ME

25   SELF-SURRENDER SO I CAN HAVE TIME TO MAKE SURE MY

1    CHILDREN ARE IN A HOME AND WILL BE TAKEN CARE OF.

2    THAT'S ALL I HAVE.

3              THE COURT: ALL RIGHT, SIR. THANK YOU VERY

4    MUCH.

5              MR. HUFFMAN: THANK YOU, YOUR HONOR. I

6    JUST WANT TO RECONFIRM WHAT HE SAYS. HE WOULD LIKE --

7    IF YOU WOULD READ IN THE SENTENCE REPORT HE DOES SAY

8    HE IS A GOOD CANDIDATE FOR SURRENDER. WHAT HE IS

9    ASKING THE COURT FOR IS TO GIVE HIM A LITTLE TIME TO

10   FIND A HOME FOR THE CHILDREN SINCE THE MOTHER OF THE

11   CHILDREN DOES NOT HAVE A PLACE SUITABLE AT THIS TIME.

12   AND THAT HE WANTS TO MAKE SURE THE CHILDREN ARE ALL

13   RIGHT.

14             THE COURT: ALL RIGHT, SIR, THANK YOU.

15             ROBERT REEDER, MR. DONATONI.

16             MR. DONATONI: YOUR HONOR, MAY I APPROACH

17   THE ROSTRUM, SIR?

18             THE COURT: LET ME ASK YOU INITIALLY, ALSO,

19   HAVE YOU READ THE PRESENTENCE REPORT FULLY, AND HAVE

20   YOU READ IT TO YOUR CLIENT OR HAD HIM READ IT SO THAT

21   HE WOULD FULLY UNDERSTAND IT?

22             MR. DONATONI: WE HAVE DONE THAT IN DETAIL,

23   YOUR HONOR, AND I BELIEVE HE FULLY UNDERSTANDS IT. IN

24   FACT, I REITERATED THAT WITH HIM THIS MORNING.

25             ROBERT, IS THAT SO?

1        DEFENDANT REEDER:  YES.

2        MR. DONATONI:  WE HAVE NO OBJECTIONS, YOUR

3    HONOR, NOR HAVE WE FILED ANY.

4        THE COURT:  VERY WELL, SIR.

5        MR. DONATONI:  MAY I PROCEED?

6        YOUR HONOR, I'M GOING TO CONFINE MY

7    ARGUMENTS, HOPEFULLY, BE BRIEF OR MAYBE BEAUTIFULLY

8    BRIEF, BECAUSE I'M GOING TO PROFFER IN A LOT OF

9    INFORMATION.

10        SIMPLY, SIR, I HAVE TWO PEOPLE HERE WHO ARE

11    NOT GOING TO TESTIFY, A SIGNIFICANT OTHER -- A SISTER

12    AND A SIGNIFICANT OTHER BY WHOM MR. REEDER HAS TWO

13    CHILDREN, AGES 12 AND 13.

14        WOULD YOU FOLKS STAND UP AND IDENTIFY

15    YOURSELVES, IF I MAY, SIR.

16        SISTER FIRST, MA'AM.

17        YOUR NAME.

18        THE WITNESS:  ROBIN SOCKOLOSKIE.

19        MR. DONATONI:  SPELL THAT.

20        THE WITNESS:  S-O-C-K-O-L-O-S-K-I-E.

21        MR. DONATONI:  AND YOU ARE ROBERT'S

22    SISTER?

23        THE WITNESS:  YES.

24        MR. DONATONI:  AND YOU ARE LISA PROUDFOOT,

25    P-R-O-U-D-F-O-O-T?

1             THE WITNESS:  YES.

2             MR. DONATONI:  LISA, YOU HAVE TWO CHILDREN

3    WITH ROBERT?

4             THE WITNESS:  YES.

5             MR. DONATONI:  AGES 12 AND 13?

6             THE WITNESS:  YES.

7             MR. DONATONI:  YES?

8             THE WITNESS:  YES.

9             MR. DONATONI:  THANK YOU.

10            I DON'T KNOW THAT UNDER CUNIN AND SALLY

11   THEY HAVE ANYTHING TO ADD, OTHER THAN WHAT I HAVE JUST

12   SAID.  I'M NOT GOING TO TRESPASS ON THE COURT'S TIME

13   WITH RESPECT TO ANY MORE THAN WHAT I HAVE JUST SAID

14   BUT I WOULD, SIR, LIKE TO CUT TO THE CHASE PERHAPS AND

15   TALK ABOUT THE NUMBERS AND THE GUIDELINE APPLICATION

16   WHERE I HOPE TO COME OUT HERE, BECAUSE I THINK THAT IS

17   REALLY WHAT I NEED TO SAY.  AND I THINK THAT IS REALLY

18   WHAT YOU ARE LOOKING TO HEAR, HOPEFULLY.

19            THE COURT:  THAT'S RIGHT.

20            MR. DONATONI:  YOUR HONOR, MR. DOMINGUEZ

21   AND HIS STAFF HAVE PRESENTED -- FIRST OF ALL, I THINK

22   THE PRESENTENCE IS EXTREMELY BALANCED.  I WILL COMMENT

23   ON THE CONCLUSION THERE OR RECOMMENDATION, THERE IN

24   ONE MOMENT.  BUT I THINK MR. DOMINGUEZ' AND MISS

25   SYKES' MOTION THAT WAS FILED WHICH THE COURT

1   PRESUMABLY HAS, WHICH HAS THE GUIDELINE APPLICATION

2   AND GRIDS AND APPLICATIONS OR GOVERNMENT

3   RECOMMENDATION HAS BEEN HELPFUL.

4           I CAN HAND UP TO THE COURT --

5           THE COURT:  I HAVE THAT.

6           MR. DONATONI:  WHAT TROUBLES ME, SIR, IF I

7   WERE YOU, AND I'M NOT -- I PROBABLY NO DOUBT WILL

8   NEVER BE A JUDGE, BUT IF I WERE IN YOUR POSITION, I

9   WOULD BE LOOKING AT THE CAREER OFFENDER STATUS OF MR.

10  REEDER, SEEING THAT HE STARTS AT 188, 235 MONTHS, BUT

11  THEN WITH HIS 5K.1'S HAVING BEEN FILED WITH A

12  RECOMMENDATION IN THE PRESENTENCE REPORT OF 48 MONTHS,

13  WHICH I LIKE, AND THE GOVERNMENT RECOMMENDATION OF 60

14  MONTHS, WHICH I LIKE 12 MONTHS LESS.

15          BUT WHAT CONCERNS ME, SIR, IS THAT PLENARY

16  GAP, NO DOUBT, BETWEEN 188 TO 235 MONTHS AND THEN

17  EITHER 48 TO 60 MONTHS AND I SAY, SIR, WITH RESPECT TO

18  THAT, I WANT TO TRY TO FOCUS ON THE APPLICATION OF

19  CAREER OFFENDER STATUS OF MR. REEDER, WITHOUT

20  DENIGRATING IT, SOMEWHAT MINIMIZING IT, BECAUSE I

21  THINK IT OVERSTATES THE UNDERLYING PREDICATE OFFENSES,

22  IF I CAN USE THAT TERM, JUDGE NEWCOMER, SOMEWHAT

23  OVERSTATED.

24          I'M NOT HERE TO DENIGRATE IT.  I'M HERE TO

25  MINIMIZE IT, BECAUSE TO OTHERWISE PRETEND IT'S NOT

1  HERE WOULD BE DISINGENUOUS, I WOULD LYING TO THE COURT

2  AND YOU WOULD KNOW THAT IN A NANOSECOND.

3          BUT WE GET THERE WITH TWO PREDICATES, SIR,

4  THAT ARE OUTLINED IN THE PRESENTENCE REPORT.  IF I SAY

5  ANYTHING HERE, MR. BROSE AND I GO BACK 20 YEARS, HE IS

6  GOING TO ARREST ME, AND HE WILL KNOW THAT I'M LEADING

7  IT.  THE AGENT AND I HAVE HAD CASES AND MR. DOMINGUEZ

8  AND I HAVE WORKED VERY CLOSELY IN THIS CASE.

9          THIS CASE STARTED AS FAR AS MY INVOLVEMENT,

10  23 MONTHS AGO WITH A PHONE CALL WHILE I WAS ON

11  VACATION, FROM MR. REEDER THAT THERE WAS GOING TO BE A

12  MEETING ONE WAY OR ANOTHER WITH THE FBI AND DETECTIVE

13  BROSE THE NEXT MORNING AND COULD I COME BACK TO WEST

14  CHESTER FROM SOUTH JERSEY AND REPRESENT HIM AND I DID.

15          AT THAT MEETING IN MY OFFICE, THEN, SIR, HE

16  BEGAN HIS COOPERATION.  HIS COOPERATION WAS

17  IMMEDIATE.  IT WAS -- I THINK MR. DOMINGUEZ WILL

18  CORRECT ME IF I'M WRONG -- SIGNIFICANT, HELPFUL.  HE,

19  I'M TOLD BY THE GOVERNMENT, THAT IN TERMS OF

20  SUBSTANTIVE INFORMATION, WHICH WAS NOT ONLY DONE BY

21  WAY OF SEVERAL DEBRIEFINGS AND AN APPEARANCE BEFORE

22  THE GRAND JURY AND TRIAL READY TESTIMONY, FORTUNATELY

23  OR UNFORTUNATELY, NONE OF THESE CASES HAD TO GO TO

24  TRIAL.  HIS TESTIMONY WAS AMONG -- OR HIS INFORMATION

25  AND TESTIMONY BEFORE THE GRAND JURY, JUDGE NEWCOMER,

1    WAS SOME OF THE MOST SIGNIFICANT AND HELPFUL AND

2    SUBSTANTIAL INFORMATION OF ANY OF THE COOPERATORS IN

3    THE CASE.

4         HE DOES COME WITH BAGGAGE.  I'M NOT GOING

5    TO SUGGEST OTHERWISE.  BUT THE 200 -- THE CAREER

6    OFFENDER OF 188 TO 235 MONTHS, SIR, THOSE PREDICATE

7    OFFENSES I'M NOT MINIMIZING FOR A SECOND, BUT I AM.

8         1982 WAS A MARIJUANA OFFENSE, 5.5 GRAMS OF

9    MARIJUANA IN STATE COURT.  TODAY, SIR, I CAN TELL YOU

10   IN STATE COURT PRACTICE, THAT WOULD GO OUT IN A DRUG

11   COURT NON-RECORD TYPE OF OFFENSE.

12        BACK IN 1982, IT IS SOMETHING FOR WHICH HE

13   RECEIVED POINTS THAT THROW HIM UP.

14        THE COURT:  1982.

15        MR. DONATONI:  THE WAY I READ THAT.

16        MR. DOMINGUEZ:  YOU HAVE THE TWO

17   BACKWARDS.

18        MR. DONATONI:  I APOLOGIZE, 1991 FOR THE

19   MARIJUANA, OKAY.

20        THE COURT:  YES.  I WONDERED IF THERE WAS

21   SOMETHING ELSE INVOLVED.

22        MR. DONATONI:  I DON'T WANT TO PUT ANYTHING

23   MORE INTO THIS THAN I HAVE.  I HAVE ENOUGH ON MY

24   PLATE.  I'M SORRY, SIR.  THE 1991 WAS MARIJUANA.  5.5

25   GRAMS OF MARIJUANA.  NOT MINIMIZING, BUT WE BOTH KNOW

1    ON FEDERAL AND STATE LEVELS THAT IS NOT THE COLOMBIAN

2    MARIJUANA CARTEL, NOR IS IT A TREMENDOUSLY SIGNIFICANT

3    AMOUNT.

4           STATE COURT PRACTICE NOW WOULD MAKE THAT A

5    SECTION 17 DISPOSITION, PROBATION WITHOUT VERDICT OR

6    DRUG COURT-TYPE THING IF THE PROGRAM EXISTED BACK

7    THEN.

8           THEN -- I'M SORRY, SIR, THEN IN 1982, THERE

9    WAS AN ASSAULT, AGAIN, MISDEMEANOR LEVEL.  NOT

10   MINIMIZING IT, BUT THAT WAS 17 YEARS AGO, AND I GUESS

11   ABOUT 15 YEARS PRIOR TO THE EXPIRATION OR, I'M SORRY,

12   THE CONCLUSION OF THIS CONSPIRACY.

13          I SAY THAT, JUDGE NEWCOMER, BECAUSE I WANT

14   TO GET YOU, SIR, SOMEHOW TO BE COMFORTABLE WITH THE

15   RECOMMENDATION OF THE PROBATION OFFICE.  AND I DON'T

16   THINK YOU CAN BE COMFORTABLE, BECAUSE I'M NOT

17   COMFORTABLE WITH 188 TO 235 MONTHS, AND THEN THE

18   RECOMMENDATION OF EITHER SOMEWHERE BETWEEN 48 AND 60

19   MONTHS.  THAT'S A HUGE JUMP OFF.  BUT WITHOUT

20   DENIGRATING THE CAREER OFFENDER STATUS FOR THAT

21   PROVISION IN THE GUIDELINES, AS CONGRESS HAS DEFINED

22   IT, AND THE COURT HAS TO DEAL WITH IT, I THINK THERE

23   IS A PLENARY GAP BETWEEN SOME OF THE CARRY OFFENDERS

24   THAT WE SEE AND THOSE SUCH AS MR. REEDER, WHICH ARE,

25   FOR LACK OF A BETTER WORD -- AGAIN, I DON'T MEAN TO BE

1    IMPOLITE OR DISRESPECTFUL -- SOMEWHAT DIMINIMUS WITH

2    RESPECT TO THE HISTORICAL NATURE OF THESE THINGS IN

3    TERMS OF TIME AND THE SERIOUSNESS OF THE OFFENSE,

4    AGAIN WITHOUT DENIGRATING THE SERIOUSNESS OF THE

5    OFFENSE, BUT WE HAVE, AGAIN, DIFFERENT LEVELS OF

6    CULPABILITY WITH RESPECT TO PRIOR OFFENSES.

7            THAT IS WHAT I WANTED TO SAY ABOUT THAT,

8    SIR.  IF I'M INCORRECT, MR. DOMINGUEZ CAN CORRECT ME.

9            HIS COOPERATION WAS IMMEDIATE, PROFOUND --

10           THE COURT:  WELL, HIS CRIMINAL HISTORY

11   POINTS, I'M SURE, YOU'RE AWARE, WILL REFLECT LIKEWISE

12   THE FACT THAT THIS INSTANT OFFENSE WAS OCCURRED --

13   OCCURRED WHILE HE WAS ON PAROLE.

14           MR. DONATONI:  YES, THEY DO.

15           THE COURT:  ALSO OCCURRED LESS THAN TWO

16   YEARS AFTER HIS RELEASE FROM PRISON.  THESE GOT HIM

17   SOME CRIMINAL HISTORY POINTS.

18           MR. DONATONI:  NO DOUBT.  I'M NOT -- I

19   DON'T WANT THE COURT TO THINK BY ME NOT MENTIONING

20   THOSE THAT I DON'T RECOGNIZE THAT THEY ARE THERE AND

21   THE COURT HAS TO CONSIDER THOSE.  I'M JUST SUGGESTING,

22   JUDGE NEWCOMER, RESPECTFULLY, THAT I HAVE STRONGER AND

23   BETTER ARGUMENTS WITH RESPECT TO THE 236 POINTS WITH

24   RESPECT TO THE CAREER OFFENDER.  SO, I DON'T MEAN TO

25   BE MISLEADING IN THAT REGARD.

1          I THINK AS IMPORTANTLY, OR AS ONE OF THE

2     LAST TWO ITEMS I WANT TO MENTION IS, THE IMMEDIACY AND

3     SIGNIFICANCE OF HIS COOPERATION AND HIS TURNABOUT

4     SINCE THEN.  HE HAS BEEN REPORTING TO PRETRIAL WEEKLY

5     WITHOUT INCIDENT.  HE IS WORKING A LOT AT HIS FATHER'S

6     GAS STATION.  WHEN I MEET WITH HIM IT IS SEVEN OR

7     EIGHT O'CLOCK AT NIGHT, BECAUSE HE PUTS IN SOME LONG

8     HOURS.  HE HAS TO, BECAUSE HE NEEDED MONEY FOR LEGAL

9     FEES, HE NEEDED MONEY TO MAINTAIN HIS FAMILY, OR AT

10    LEAST SUPPORT THE CHILDREN.  I DON'T WANT TO SUGGEST

11    THAT HE IS MARRIED.  BUT HE HAS TWO KIDS THAT HE IS

12    OBLIGATED TO AND DOES SUPPORT THERE.

13          SIR, ONE OTHER POINT, BECAUSE I THINK THE

14    PRESENTENCE REPORT IS BALANCED AND COMPLETE AND THAT

15    IS, THE GOVERNMENT'S MEMO OUTLINES SOMETHING THAT IS

16    IMPORTANT, BECAUSE IT'S TRUE AND IT'S UNFORTUNATE THAT

17    THIS TYPE OF ACTIVITY HAS INVADED WHAT THEY REFER TO

18    AS THE MOST VULNERABLE COMMUNITY IN THE DISTRICT.

19    THAT BEING THE YOUNG AMISH.  THIS CONSPIRACY DID SO

20    AND THIS MEMBER WAS A MEMBER OF THIS CONSPIRACY.  I

21    THINK MR. DOMINGUEZ WILL CONFIRM WITH ME, SIR, THAT WE

22    WERE NOT PART OF THAT PRONG OF THE CONSPIRACY THAT

23    WENT INTO THE AMISH COMMUNITY.  WE COMMITTED CRIMES,

24    WE COMMITTED NARCOTICS OFFENSES, WE COMMITTED FEDERAL

25    FELONIES, BUT THEY WERE NOT INTO THAT VULNERABLE

1    COMMUNITY.  IN THE OVERALL SCHEME OF THINGS, OUR

2    CONSPIRACY DID GO THERE, BUT WE, PERSONALLY, IN TERMS

3    OF OUR SCOPE OF THAT CONSPIRACY, DID NOT.

4           SIR, FINALLY, TO THE EXTENT THAT I CAN

5    PERSUADE THE COURT, THIS MAN, HAVING BEEN COOPERATING

6    FOR AT LEAST 23 MONTHS, HAVING BEEN UNDER INDICTMENT

7    AND CHANGE OF PLEA FOR SEVERAL MONTHS AND HAS REPORTED

8    TO PRETRIAL RELIGIOUSLY WITHOUT ANY INCIDENT, THAT HE

9    BE A CANDIDATE FOR SELF-SURRENDER.

10          ULTIMATELY, SIR, I WOULD ASK THE COURT TO

11    CONSIDER AND ACCEPT THE RECOMMENDATION OF THE

12    PROBATION OFFICE BECAUSE HE HAS EARNED IT.  HE HAS

13    EARNED IT IN THE SENSE OF HIS COOPERATION.  THE

14    TIMELINESS OF HIS COOPERATION, THE VALUE OF HIS

15    COOPERATION.  HIS REMORSE --

16          THE COURT:  HAS IT BEEN 100 PERCENT?

17          MR. DONATONI:  HAS IT BEEN 100 PERCENT?  I

18    THINK IT HAS BEEN 100 PERCENT TO THE EXTENT THAT HE IS

19    CAPABLE 100 PERCENT.  THERE'S A GLITCH IN THE -- IN

20    THE MEMO, WHERE -- I DON'T WANT TO REPEAT IT

21    NECESSARILY WORLDLY, WHERE HE GAVE INFORMATION TO

22    SOMEONE ELSE BUT UNDER CIRCUMSTANCES --

23          THE COURT:  WHICH I UNDERSTAND SERIOUSLY

24    INTERFERED WITH THE INVESTIGATION.

25          MR. DONATONI:  BUT DID NOT -- YEAH, BUT THE

1   GOVERNMENT LANDED ON ITS FEET, THANKFULLY, AND, QUITE

2   FRANKLY, SIR, THAT WAS ALL PREATTORNEY CONDUCTED

3   STEERING OF THIS CASE.  NOT THAT I'M TRYING TO

4   DISTANCE MYSELF FROM THAT.

5              THE COURT:  I UNDERSTAND.

6              MR. DONATONI:  WITH THAT BEING SAID, UNLESS

7   THERE ARE ANY QUESTIONS, I THANK YOU FOR YOUR PATIENCE

8   IN ALLOWING ME TO MAKE THIS PRESENTATION.

9              THE COURT:  ALL RIGHT.  MR. REEDER HAS A

10  RIGHT TO MAKE A STATEMENT ON HIS OWN BEHALF, IF HE

11  WISHES TO.  IF SO, THIS WOULD BE THE TIME.

12             MR. DONATONI:  I DIDN'T MEAN TO RUN THROUGH

13  THAT, SIR, BUT I THOUGHT THOSE WERE THE KIND OF ISSUES

14  YOU WANTED TO HEAR.

15             THE CLERK:  STATE YOUR FULL NAME FOR THE

16  RECORD.

17             THE WITNESS:  ROBERT REEDER.

18             ROBERT REEDER, DEFENDANT SWORN

19                 DIRECT EXAMINATION

20  BY MR. DONATONI:

21  Q.  ROBERT, STATE TO JUDGE NEWCOMER, NOW IS THE TIME,

22  THE ONLY TIME YOU WILL HAVE TO SAY SOMETHING WITH

23  RESPECT TO THE SENTENCE THAT HE DRAFTS AND IMPOSES

24  WITHIN THE NEXT HOUR OR SO.  TELL HIM WHAT YOU WANT TO

25  TELL HIM.  TELL HIM WHAT IS IN YOUR HEART AND MIND.

1   A.   I WOULD LIKE TO SAY THAT I WAS A DRUG ADDICT BACK

2   THEN.   THAT WHAT I DID IS -- I DID IT.   NOBODY ELSE

3   DID IT.   I CAN'T BLAME NOBODY FOR DOING WHAT I DID.   I

4   WORK EVERYDAY NOW.   I'M OFF DRUGS.   I HAVE TWO

5   DAUGHTERS I'M TAKING CARE OF, AND MY MAIN CONCERN IS

6   FOR THEM.   I DON'T KNOW HOW THEY ARE GOING TO SURVIVE

7   WITHOUT ME.   IF THERE IS ANYWAY THAT I COULD BE

8   SENTENCED TO TAKE CARE OF THEM AND SUPPORT THEM,

9   THAT'S MY MAIN CONCERN.   I WORK EVERYDAY.   I GO TO

10  WORK, I COME HOME, GO TO SLEEP.   THAT'S ALL I DO

11  ANYMORE.

12            THAT'S ALL I HAVE TO SAY.

13            THE COURT:   THANK YOU.

14            MR. DONATONI:   THAT'S ALL.

15            MR. DOMINGUEZ:   I HAVE NO QUESTIONS.

16            MR. DONATONI:   YOUR HONOR, MAY I ASK ONE

17  INDULGENCE, MAY HE BE EXCUSED FOR FIVE MINUTES?   MAY I

18  BE EXCUSED FROM THE COURTROOM TO MAKE A CALL ON CHILD

19  CARE ISSUES?

20            THE COURT:   YES.

21            RUSSELL SAMUELS.   PETER MAYNARD.

22            MR. MAYNARD:   GOOD MORNING, YOUR HONOR.

23  MAY IT PLEASE THE COURT, I APOLOGIZE.   NORMALLY I

24  SUBMIT LETTERS IN ADVANCE.   I DID NOT HAVE AN

25  OPPORTUNITY TO DO SO.   I HAVE THREE LETTERS THAT I

1    WOULD -- WHICH I WOULD ASK THE COURT TO REVIEW PRIOR

2    TO IMPOSING SENTENCE.  I HAD PROVIDED COPIES TO MR.

3    DOMINGUEZ.

4              I HAVE TWO WITNESSES WHICH I WOULD LIKE TO

5    PRESENT TO THE COURT BRIEFLY.

6              THE COURT:  GO AHEAD AND CALL THEM.

7              MR. MAYNARD:  THANK YOU, YOUR HONOR.  I

8    WOULD CALL RALPH SAMUELS.

9              THE COURT:  SWEAR IN MR. SAMUELS.

10             THE CLERK:  STATE YOUR FULL NAME FOR THE

11   RECORD.

12             RALPH SAMUELS, DEFENSE WITNESS, SWORN.

13                  DIRECT EXAMINATION

14   BY MR. MAYNARD:

15   Q.   MR. SAMUELS, YOU ARE RUSSELL SAMUELS' FATHER?

16   A.   YES.

17   Q.   WOULD YOU TELL JUDGE NEWCOMER WHO CAME DOWN TODAY

18   TO BE HERE FOR MR. SAMUELS WHEN THE COURT IMPOSES

19   SENTENCE?

20   A.   MY WHOLE FAMILY, THAT WHOLE ROW THERE.

21             THE COURT:  WOULD YOU LIKE THEM TO RISE?

22             THEY CAME FROM WHERE, DID YOU SAY?

23             THE DEFENDANT:  MY FAMILY --

24             THE COURT:  THEY CAME DOWN FROM WHERE?

25             THE WITNESS:  BLUE BELL AND NEW HOLLAND, IN

1    THAT AREA.

2              THE COURT:  GOOD MORNING.  WELCOME.

3    BY MR. MAYNARD:

4    Q.  WHAT WOULD YOU LIKE TO TELL THE COURT ABOUT YOUR

5    SON?

6    A.  WELL, FIRST OF ALL, I ASK YOUR MERCY UPON HIM,

7    YOUR HONOR, AND I WOULD LIKE TO TELL YOU THAT RUSS

8    GAVE MY WIFE AND I -- HIS MOM, A CALL ONE EVENING AND

9    SAID, I WOULD LIKE TO COME AND TALK TO YOU.  SO HE

10   CAME TO US.  THAT WAS BACK IN, I THINK, '97, DECEMBER

11   OF '97, AND HE SAID, DAD AND MOM, HE SAID, I NEED

12   HELP.  HE SAID, WILL YOU STAND WITH US?  AND I COULD

13   SEE THE SINCERENESS IN HIM, IN HIS FACE.  AND I SAID,

14   RUSS, I SAID, IF YOU ARE WILLING, I'M WILLING TO HELP

15   YOU.  AND WE HAVE STUCK BY HIM.  HE'S SEEN THE WAY WE

16   LIVE AND HE FOLLOWED RIGHT AFTER IN OUR FOOT STEPS.

17   WE GO TO CHURCH EVERY SUNDAY.  WE LOVE THE LORD AND HE

18   HAS ACCEPTED THE LORD AND HE IS A BORN AGAIN

19   CHRISTIAN.  HE HAS TURNED HIS LIFE AROUND COMPLETELY.

20   I MEAN, IT'S AMAZING.  IT'S A MIRACLE.

21             THE COURT:  HOW OLD IS HE?

22             THE WITNESS:  48.

23             THE COURT:  48.

24             THE WITNESS:  I WAS 41 -- ANYWAY, HE HAS

25   TURNED HIS LIFE AROUND.  AND ACTUALLY HE IS AN ASSET

1    TO OUR FAMILY. I CAN TALK TO RUSSELL. HE AND I CAN

2    TALK, WE CAN LAUGH TOGETHER, WE CAN WORK TOGETHER, AND

3    HE IS -- SOMETHING GOING ON IN THE FAMILY, HE IS THE

4    FIRST ONE THERE. AND WE WOULD BE LOST WITHOUT HIM.

5    AND HE GOES TO WORK IN THE MORNING. HE HAS A BUSINESS

6    OF HIS OWN, HE STARTED, AND HE GOES TO WORK IN THE

7    MORNING EARLY, HE GETS HOME, EARLY TO BED. HE HAS A

8    PROSPEROUS BUSINESS. HE HAS TWO EMPLOYEES WORKING FOR

9    HIM. WHEN HE STARTED OUT IN THIS JOB OF TEARING BARNS

10   DOWN, I HELPED HIM WITH THE FIRST ONE A LITTLE BIT,

11   BUT IT'S A LITTLE TOO HARD WORK FOR ME, SO HE

12   CONTINUED ON WITH IT. HE IS DOING A GOOD JOB.

13   EVERYBODY HE DEALS WITH COMMENTS HOW GOOD A JOB HE

14   DOES. I'M PROUD OF HIM.

15   BY MR. MAYNARD:

16   Q.   MR. SAMUELS, IF I MAY, YOU INDICATED THAT YOUR

17   SON CONTACTED YOU IN DECEMBER OF 1997?

18   A.   YES.

19   Q.   ASKED TO SPEAK TO YOU AND YOUR WIFE?

20   A.   YES.

21   Q.   AT THAT TIME, TO YOUR KNOWLEDGE, HAD YOUR SON

22   BEEN CONTACTED BY THE FEDERAL BUREAU OF INVESTIGATION?

23   A.   NOT THAT I KNOW OF, NO.

24   Q.   AT THAT TIME, TO YOUR KNOWLEDGE, WAS YOUR SON

25   AWARE THAT HE WAS THE SUBJECT OR THE FOCUS OF AN

1    INVESTIGATION?

2    A.    I DON'T THINK SO.

3    Q.    AT THAT TIME, WAS RUSS FACING ANY CRIMINAL

4    CHARGES FROM THE STATE?

5    A.    NO.

6    Q.    DID YOUR SON TELL YOU WHY, AT THIS POINT, HE

7    WANTED TO MAKE THE CHANGE IN HIS LIFE?

8    A.    HE WANTED TO GET HIS LIFE RIGHT.  HE WAS JUST

9    TIRED THE WAY HE WAS LIVING.  HE WANTED TO GIVE HIS

10   LIFE -- NOT TO BRAG, BUT I THINK HE SEEN EXAMPLE IN

11   THE REST OF THE FAMILY.  WE ALL GO TO CHURCH EVERY

12   SUNDAY, AND SEE HOW WE LIVE AND HOW WE ENJOY

13   OURSELVES.  BY THE WAY, HE HAS TOLD ME THAT HE HAS

14   NEVER BEEN HAPPIER IN HIS LIFE EXCEPT WHAT IS HANGING

15   OVER HIS HEAD RIGHT NOW.  HE HAS COMPLETELY TURNED

16   AROUND.

17   Q.    IS THERE ANYTHING FURTHER THAT YOU WOULD LIKE TO

18   ADD FOR THE COURT?

19   A.    I HATE TO DO THIS TO MY FAMILY.  VERY IMPORTANT

20   TO ME.

21   Q.    I'M SORRY.

22   A.    I WOULD HATE TO LOSE A PART OF MY FAMILY.  VERY

23   IMPORTANT TO ME.

24   Q.    OF COURSE.  ALL RIGHT, SIR.  THANK YOU VERY

25   MUCH.

1           MR. DOMINGUEZ:  I HAVE NO QUESTIONS, MR.

2    SAMUELS.  THANK YOU FOR COMING DOWN.

3           MR. MAYNARD:  THE SECOND INDIVIDUAL, YOUR

4    HONOR, IS DWIGHT MILLER.

5           THE CLERK:  STATE YOUR FULL NAME FOR THE

6    RECORD.

7           THE WITNESS:  DWIGHT MILLER.

8           DWIGHT MILLER, DEFENSE WITNESS, SWORN.

9               DIRECT EXAMINATION

10   BY MR. MAYNARD:

11   Q.   YOU ARE ACQUAINTED WITH RUSSELL SAMUELS?

12   A.   YES, I AM.

13   Q.   HOW ARE YOU ACQUAINTED WITH RUSS SAMUELS?

14   A.   I MET RUSS THE LATER PART OF 1997.  HE HAD COME

15   TO ME THROUGH ONE OF MY EMPLOYEES.  WE NEEDED SOME

16   HELP ON A PROJECT THAT WE WERE DOING OUT IN INDIANA.

17   I SENT HIM OUT TO INDIANA TO HELP FINISH UP SOME OF

18   OUR BUILDING PROJECTS THAT WE WERE DOING OUT THERE AT

19   THE TIME.

20   Q.   MR. SAMUELS HAS CONTINUED TO WORK FOR YOU AS AN

21   INDEPENDENT CONTRACTOR?

22   A.   YES, HE HAS.  WE ARE -- I OWN A FIBERGLAS

23   FABRICATION COMPANY.  WE DO A LOT OF ARCHITECTURAL

24   BUILDING PRODUCTS.  OFTENTIMES WE ARE ASKED TO INSTALL

25   THOSE PRODUCTS ONTO THE BUILDINGS AND AT THE TIME IN

1   1997, THAT'S WHAT WE WERE DOING.  WE NEEDED SOME HELP,

2   RUSS CAME, HE HELPED US, HE HAD -- AT THAT TIME CAME

3   IN AS AN EMPLOYEE.  IN 1998, WHICH WAS THE LAST YEAR,

4   WE HAD PUT HIM IN CHARGE OF A PROJECT THAT WE DID IN

5   LANCASTER, PENNSYLVANIA DOING A LARGE INSTALLATION OF

6   A LARGE -- TWO LARGE DOMES AND SOME OTHER PRODUCTS ON

7   A BUILDING.  WE WERE VERY HAPPY WITH WHAT HE DID.  THE

8   OWNERS OF THE BUILDING ARE VERY HAPPY.  THE OWNERS OF

9   THE BUILDING WHICH WE WERE WAY DOWN THE LINE AS FAR AS

10  THE CONTRACTORS GO, BUT THE OWNERS OF THAT BUILDING

11  CAME TO ME SEVERAL TIMES AND TOLD ME HOW MUCH THEY

12  APPRECIATE THE WORK THAT RUSS WAS DOING AND THE GOOD

13  JOB THAT HE WAS DOING.  THEY TOLD ME THAT I SHOULD DO

14  WHATEVER I CAN TO KEEP ONTO RUSS, HANG ONTO HIM AND

15  KEEP HIM AS PART OF MY ORGANIZATION, BECAUSE OF THE

16  JOB THAT HE WAS DOING.  SO WITH THAT, WE HAD ANOTHER

17  OPPORTUNITY TO DO A PROJECT FOR A COLLEGE IN NEW

18  JERSEY WHICH WE ARE PRESENTLY MANUFACTURING.  I HAVE

19  ASKED RUSS THIS TIME AS A SELF-EMPLOYED CONTRACTOR TO

20  HELP ME INSTALL A PROJECT THERE FOR THE COLLEGE OF NEW

21  JERSEY, HE HAS AGREED TO THAT.  THAT PROJECT, YOUR

22  HONOR, IS SUPPOSED TO START IN SEPTEMBER AND IT WILL

23  TAKE UNTIL THE END OF MARCH.  WE ACTUALLY HAVE TWO

24  CONTRACTS ON TWO DIFFERENT BUILDINGS FOR THE SAME

25  COLLEGE.  THAT IS THE COLLEGE OF NEW JERSEY.  THE TWO

1    CONTRACTS ARE SUPPOSED TO BE FINISHED UP SOMETIME LATE

2    SPRING OF THE YEAR 2000 WITH SOME MINOR DETAILS GOING

3    ON.

4            THE COURT:  WHAT DO YOU MAKE FOR THESE

5    BUILDINGS, THE TRELLISES.

6            THE WITNESS:  EXTERIOR CORNICE WORK, WINDOW

7    SURROUNDS, COLUMNS, ALL THE STUFF ON THE EXTERIOR OF

8    THE BUILDING.

9            THE COURT:  MILL WORK?

10           THE WITNESS:  YES.  THAT IS PRETTY MUCH

11   WHAT WE DO.  AND IT'S KIND OF A UNIQUE PRODUCT.  IT'S

12   BEING USED MORE AND MORE ALL THE TIME, AND IT'S HARD

13   TO FIND PEOPLE TO INSTALL IT.  AND THAT'S WHY WE ARE

14   ASKED MORE AND MORE TO INSTALL IT OURSELVES AND, LIKE

15   I SAID, THE TWO JOBS THAT WE HAVE HAD RUSS DO, HE CAME

16   INTO THE END OF ONE, AND DID THE COMPLETE JOB FOR

17   1998, THEY WERE VERY, BOTH VERY SIZEABLE, AND HE DID A

18   VERY GOOD JOB.  AND I'M ASKING ON MY BEHALF AND ON

19   BEHALF OF RUSS, THAT IF THE COURT COULD TAKE THAT INTO

20   CONSIDERATION.  WE ARE COUNTING ON RUSS DOING THIS.

21   IT WILL BE A CHALLENGE FOR MY COMPANY IF HE IS NOT

22   AVAILABLE TO DO THIS.  I HAVE SEEN RUSS -- I HAVE NOT

23   KNOWN RUSS BEFORE HE WAS INTO THE SITUATION THAT HE IS

24   IN.  I WILL SAY WHEN WE MET, IT WAS SHORTLY AFTER WE

25   MET WHERE HE LET ME KNOW THAT HE HAS MADE A CHANGE IN

1    HIS LIFE.  HE DID NOT GO INTO DETAILS, BUT DID TELL ME

2    THAT HE HAD DECIDED THAT HE WAS GOING TO FOLLOW GOD,

3    MAKE A COMMITMENT TO GOD.  AND IT WAS NOT UNTIL

4    SEVERAL MONTHS, ACTUALLY ALMOST EIGHT MONTHS

5    AFTERWARDS, WHEN I FOUND OUT THAT HE -- HIS

6    BACKGROUND.  BUT HE DID MAKE THAT DECISION BEFORE HE

7    FOUND OUT HE WAS IN PROBLEMS -- HAVING PROBLEMS AND MY

8    WORKING WITH HIM.  I TRUST HIM.  HE'S DONE A

9    REMARKABLE JOB IN HIS OWN BUSINESS.  HE HAS BEEN KEPT

10   BUSY.  I HAVE NEVER HAD A TIME IN THE LAST TWO YEARS

11   WHEN HE WAS NOT WORKING FOR ME THAT HE WAS NOT WORKING

12   ON HIS OWN DOING SOMETHING ELSE AS A SELF-EMPLOYED

13   CONTRACTOR.  I BELIEVE THAT HE HAS DEFINITELY MADE A

14   CHANGE AND HE IS DOING HIS BEST.

15            THE COURT:  I UNDERSTAND WHAT YOU ARE

16   SAYING.  THANK YOU.

17            MR. MAYNARD:  THANK YOU.

18            MR. DOMINGUEZ:  THANK YOU, SIR.

19            MR. MAYNARD:  IF I MAY, YOUR HONOR, I WOULD

20   LIKE TO HAVE MR. SAMUELS ADDRESS THE COURT HIMSELF.

21            THE COURT:  VERY WELL.

22            MR. SAMUELS, YOU HAVE A RIGHT TO MAKE A

23   STATEMENT ON YOUR OWN BEHALF AT THIS TIME.

24            THE CLERK:  STATE YOUR FULL NAME FOR THE

25   RECORD.

1     RUSSELL SAMUELS, DEFENDANT, SWORN

2     DIRECT EXAMINATION

3   BY MR. MAYNARD:

4   Q.   MR. SAMUELS, WHAT WOULD YOU LIKE TO TELL THE

5   COURT?

6   A.   I WOULD -- LIKE MY FATHER SAID, I DON'T WANT TO

7   REPEAT THINGS BUT LIKE MY FATHER SAID, I DID COME TO

8   MY PARENTS AND I ASKED THEM FOR HELP.  IT WAS THE

9   HARDEST THING I EVER DONE IN MY LIFE TO ADMIT TO MY

10  PARENTS THAT I WAS MAKING A MISTAKE IN MY LIFE BUT I

11  DID THAT.  I TOOK THAT STEP.  AND SINCE THAT I HAVE

12  BECOME A CHRISTIAN, I HAVE BECOME A BUSINESSMAN,

13  PROFITABLE BUSINESSMAN.  EVERY QUARTER, MY

14  ACCOUNTANT -- I HAVE AN ACCOUNTANT DOES MY BOOKS, HE

15  HAS SEEN A PROFIT EVERY QUARTER.  THEY ARE --

16  EVERYTHING IS GETTING BETTER.  I BUILT THIS BUSINESS.

17  I BROUGHT MY SON INTO IT.  HE WORKS FOR ME.  I BROUGHT

18  ANOTHER YOUNG MAN INTO IT THAT HAS A PREGNANT

19  GIRLFRIEND.  I ALSO HAVE MY DAD HELPS ME PART-TIME

20  SOMETIMES.  MY BROTHER HELPS ME PART-TIME, AND I HAVE

21  ANOTHER YOUNG GUY HELPS ME PART-TIME.  SO I'VE REALLY

22  BEEN WORKING AT IT AND, LIKE I SAID, I BECOME ACTIVE

23  IN THE CHURCH, I JUST --

24  Q.   AT THE TIME THAT YOU WENT AND SPOKE TO YOUR

25  PARENTS IN DECEMBER OF 1997, WERE YOU AWARE THAT THERE

1   WAS AN INVESTIGATION ONGOING WITH REGARD TO THE

2   DISTRIBUTION OF NARCOTICS IN CHESTER COUNTY?

3   A.   NO, I WAS NOT.

4   Q.   DID THAT INVESTIGATION IN ANY WAY INFLUENCE YOUR

5   DECISION TO SPEAK TO YOUR PARENTS?

6   A.   NO, IT DID NOT.

7   Q.   DID YOU KNOW THE FBI WAS INVESTIGATING YOU?

8   A.   NO, I DID NOT.

9   Q.   WERE YOU AWARE THAT CRIMINAL CHARGES WERE GOING

10  TO BE FILED?

11  A.   NO.

12  Q.   IS THERE ANYTHING FURTHER THAT YOU WOULD LIKE TO

13  ADD TO THE COURT?

14  A.   I WOULD JUST LIKE TO KEEP -- BE WITH MY FAMILY

15  AND KEEP MY BUSINESS GOING.  I'M GETTING A LITTLE OLD

16  TO BE STARTING OVER.  AND RIGHT NOW, I WORKED HARD IN

17  THE LAST YEAR AND HALF TO MAKE THINGS WORK, THEY ARE

18  WORKING.  THANK YOU.

19          THE COURT:  MR. SAMUELS, ONE MORE THING,

20  HAVE YOU READ THE PRESENTENCE REPORT THOROUGHLY

21  YOURSELF?

22          DEFENDANT SAMUELS:  YES.

23          THE COURT:  DISCUSSED IT FULLY WITH YOUR

24  ATTORNEY?

25          DEFENDANT SAMUELS:  YES.

1           THE COURT:  YOU UNDERSTAND IT ALL RIGHT?

2           DEFENDANT SAMUELS:  I ONLY HAVE ONE PROBLEM

3   WITH IT, AND I TALKED TO DAVE ABOUT IT AND THE FACT

4   THAT THEY CALLED ME A HANG-AROUND.  I REALLY -- I

5   DON'T WANT TO BE ASSOCIATED WITH THOSE -- OBVIOUSLY, I

6   WANT TO SAY I'M SORRY FOR WHAT I DONE.  I KNOW I DONE

7   WRONG.  BUT I'M SORRY.  I HAD A COUPLE OF FRIENDS.

8   THEY WERE PAGANS.  I DID NOT ATTEND PAGAN GATHERINGS,

9   I DID NOT.  NOTHING TO DO WITH THE PAGANS.  I JUST HAD

10  A COUPLE OF FRIENDS THAT WERE PAGANS.  TO ME THERE IS

11  A DIFFERENCE.

12          THE COURT:  WELL, I THINK THAT IS WHAT WAS

13  CLASSIFIED AS "HANG-AROUNDS", WAS IT NOT?

14          DEFENDANT SAMUELS:  NO, SIR.

15          THE COURT:  HOW DID YOU DIFFER FROM A

16  HANG-AROUND?

17          DEFENDANT SAMUELS:  I DID NOT GO AROUND TO

18  -- I DID NOT GO TO PAGAN PARTIES.  I JUST HAD, LIKE,

19  A COUPLE OF FRIENDS THAT WERE -- THAT HAPPENED TO BE

20  PAGANS.  THAT IS NOT -- THAT WAS NOT MY MAIN CONCERN

21  TO BE, TO BECOME A PAGAN.  THAT IS NOT WHY I WAS WITH

22  THESE FRIENDS.  MY MAIN CONCERN IN LIFE WAS NOT TO BE

23  A PAGAN.  THAT WAS NOT MY DESIRE.

24          MR. MAYNARD:  THE TERM "HANG-AROUNDS" USED

25  IN THE PRESENTENCE INDICATES THAT THAT PARTICULAR

1    INDIVIDUAL WISHED TO BECOME A MEMBER OF THE PAGANS.

2    MR. SAMUELS NEVER HAD THAT DESIRE.

3           THE COURT: WELL, NOT NECESSARILY HAD THE

4    DESIRE TO, BUT WERE AMONG THOSE WHO MIGHT BECOME

5    MEMBERS, WASN'T THAT IT?

6           MR. DOMINGUEZ: YES.

7           THE COURT: COULD BE INVITED AFTER THEY

8    WENT THROUGH THAT STAGE?

9           MR. MAYNARD: RIGHT. MR. SAMUELS NEVER

10   REQUESTED OR ASKED OR DESIRED TO BE A MEMBER OF THE

11   PAGANS.

12         THE COURT: ALL RIGHT.

13         MR. DOMINGUEZ: YOUR HONOR, I THINK THAT IS

14   ACCURATE. I THINK WE ARE GETTING INTO THE DEFINITION

15   OF PROSPECT WHERE WE ARE SAYING SOMEONE IS ACTIVELY

16   WANTING TO BECOME A MEMBER, HANG-AROUNDS, IS THAT HE

17   HUNG AROUND WITH PAGANS BY HIS OWN ADMISSION. THAT'S

18   THE WAY WE CLASSIFIED HIM.

19         MR. MAYNARD: VERY BRIEF REMARKS.

20         THE COURT: I THINK YOUR CLIENT IS

21   FINISHED. AM I RIGHT? THANK YOU, SIR. YOU MAY TAKE

22   YOUR SEAT, IF YOU LIKE.

23         MR. MAYNARD: BRIEFLY, YOUR HONOR. AS HAS

24   BEEN INDICATED BY ONE OF THE OTHER DEFENDANTS, MR.

25   SAMUELS WAS NOT RESPONSIBLE FOR INTRODUCING CONTROLLED

1    SUBSTANCES INTO A CLOSED COMMUNITY.  ANOTHER PART OF

2    THE CONSPIRACY DID IN FACT DO THAT.  MR. SAMUELS DID

3    NOT.  HE WAS NOT AWARE THAT WAS OCCURRING, HAD NO PART

4    IN THAT.  AS HAS ALSO BEEN INDICATED, YOUR HONOR, THE

5    INDIVIDUALS PRESENT IN THE COURT HAVE CHANGED.

6    FORTUNATELY, MR. SAMUELS IS EASILY DISTINGUISHABLE IN

7    THAT HIS CHANGE OCCURRED PRIOR TO THE INVESTIGATION,

8    PRIOR TO THE INDICTMENT, PRIOR TO BEING CONTACTED BY

9    THE FEDERAL BUREAU OF INVESTIGATION.  HE HAS STARTED

10   HIS OWN REHABILITATION.  IT'S EASY WHEN THE COLD LIGHT

11   OF LAW IS SHINED ON YOU TO SAY, HERE I AM, LORD.  MR.

12   SAMUELS HAD DONE THAT BEFORE ANY OF THIS CAME DOWN.

13   LIKE I CAN CONTRAST HIS LIFE PRIOR TO WITHDRAWING FROM

14   THE CONSPIRACY WITH HIS CURRENT LIFE BY SAYING, HE DID

15   NOT WORK, HE DEALT DRUGS, HE ENGAGED IN THE ASSAULTS,

16   POST WITHDRAWAL, HE COOPERATED, ALTHOUGH THERE WAS

17   SOME RESERVATION BESIDES HIS COOPERATION, SOMETHING

18   THAT IS NOT MENTIONED IN THE REPORTS, THAT HE ALSO

19   TESTIFIED BEFORE THE CHESTER COUNTY GRAND JURY WHICH

20   GOES TO HIS COOPERATION WITH THE GOVERNMENT.

21          THE COURT:  WELL, I THINK ONE LISTENING TO

22   THIS ARTICULATION HERE COULD GET THE IMPRESSION THAT

23   HE REALLY HARDLY DID ANYTHING WRONG.  I THINK IT MIGHT

24   BE WELL IF WE ALL UNDERSTAND THAT HE WAS A MEMBER OF A

25   CONSPIRACY THAT WAS EXTREMELY ACTIVE IN DISTRIBUTING

1    AND SELLING COCAINE.

2           MR. MAYNARD: I DO NOT MEAN TO SUGGEST THAT

3    MR. SAMUELS DID NOTHING WRONG.

4           THE COURT: IF HE WAS NOT A HANG-AROUND

5    WHEN HE DID THOSE THINGS, HE SOMEHOW GOT AWFUL CLOSE

6    TO BEING ONE, BECAUSE HE SURE WAS WITH THEM. AND THAT

7    INCLUDED THE VIOLENCE THAT SOMETIMES OCCURRED ALONG

8    WITH IT.

9           MR. MAYNARD: UNFORTUNATELY, VIOLENCE IS

10    PART AND PARCEL OF THE DRUG CULTURE. MR. SAMUELS

11    PARTICIPATED IN THAT. AGAIN, WHEN HE WITHDREW FROM

12    THAT CULTURE, HE WITHDREW FROM THE VIOLENCE.

13          THE COURT: WELL, YOU COULD SAY THAT. ON

14    THE OTHER HAND, INDEPENDENT INITIATED ACTS OF VIOLENCE

15    ARE MORE LIKE AN AGGRESSION OR AN ATTACK THAN AN

16    ACCIDENTAL PART OF BEING INVOLVED IN THE TRADE. I

17    DON'T DEFEND EITHER ONE, BUT CERTAINLY INDEPENDENT

18    AGGRESSIVE ACTS ARE PRETTY HIGH ON THAT LIST OF

19    CULPABILITY. ALL RIGHT. I JUST WANTED TO BE SURE

20    THAT YOU WERE NOT SAYING THAT NONE OF THIS WAS SO.

21          MR. MAYNARD: UNFORTUNATELY, THIS IS A

22    SITUATION IN WHICH THE COURT IS SENTENCING MR. SAMUELS

23    FOR WHAT HE WAS, NOT FOR WHAT HE IS NOW, NOT FOR WHAT

24    HE HAS BECOME VOLUNTARILY.

25          I DO HAVE TWO REQUESTS, IF I MAY.

1          THE COURT:  THAT'S TRUE OF EVERYBODY WHO

2   COMES INTO THIS COURTROOM.

3          MR. MAYNARD:  THAT IS ABSOLUTELY TRUE.

4   EVERYONE FINDS THE LORD WHEN THEY ARE UNDER THE GUN,

5   BUT MR. SAMUELS --

6          THE COURT:  NOT EVERYONE.

7          MR. MAYNARD:  IF I MAY, YOUR HONOR, I HAVE

8   TWO REQUESTS.  AS INDICATED IN THE ONE REPORT, MR.

9   SAMUELS IS A GOOD CANDIDATE FOR SELF-SURRENDER.  HE

10  HAS A CONTRACT OUT THAT WILL RUN UNTIL APPROXIMATELY

11  SEPTEMBER 1ST.  HE HAS A COUPLE WEEKS WORTH OF WORK

12  THAT HE HAS TO FINISH UP.  I WOULD ASK THAT YOU

13  DESIGNATE HIM TO THE BOOT CAMP OR MINERSVILLE.

14          THE COURT:  THANK YOU, SIR.

15          PERHAPS WE WOULD DO WELL TO TAKE A SHORT

16  BREAK.  WOULD THAT BE A GOOD IDEA?  LET'S TAKE A SHORT

17  RECESS, SAY FIVE, TEN MINUTES MAX.

18          (BREAK TAKEN.)

19          MR. DOMINGUEZ:  YOUR HONOR, I DON'T WANT TO

20  DO THIS ON THE RECORD, I KNOW THAT THERE ARE SOME

21  CHILDREN PRESENT IN THE COURTROOM, AND I BELIEVE THAT

22  THEY ARE MR. MELLOT'S CHILDREN AND I DON'T SEE THEM

23  HERE YET, BUT I EXPECT THAT THEY ARE GOING TO BE

24  WANDERING IN.  SOME OF THE THINGS THAT I'M GOING TO BE

25  SAYING PROBABLY ARE NOT THINGS THAT I WOULD WANT MY

1    CHILDREN TO HEAR, SO I WOULD JUST GIVE COUNSEL AN

2    OPPORTUNITY TO HAVE THOSE CHILDREN WAIT OUTSIDE IF HE

3    DEEMS IT APPROPRIATE.

4            THE COURT:  ALL RIGHT.  COUNSEL, YOU HAVE

5    HAD ADVANCE NOTICE.  DO AS YOU DETERMINE.

6            I BELIEVE EVERYBODY IS PRESENT NOW.

7            MR. DOMINGUEZ:  YOUR HONOR, I AM GOING TO

8    BE VERY BRIEF.  WE FILED AN EXTENSIVE SENTENCING

9    MEMORANDUM, WHICH I BELIEVE TAKES INTO CONSIDERATION

10   THE SENTENCING FACTORS THAT EXIST IN THIS CASE.  I'M

11   AVAILABLE TO ANSWER ANY QUESTIONS THE COURT MAY HAVE

12   REGARDING A PARTICULAR DEFENDANT OR A PARTICULAR ISSUE

13   ADDRESSED IN THE MEMORANDUM, BUT --

14           THE COURT:  TELL ME BEFORE, IF YOU WILL,

15   5KS, YOU FILED 5KS, YOU MADE REFERENCE TO IT IN YOUR

16   SO-CALLED MOTION FOR DEPARTURE AND SENTENCE,

17   SENTENCING MEMORANDUM, BUT IT LEAVES -- IT'S NOT

18   TOTALLY EXPLANATORY.  SO IF YOU WOULD JUST BE

19   ARTICULATE ON WHICH ONES YOU HAVE FILED IT FOR, I

20   WOULD APPRECIATE IT.

21           MR. DOMINGUEZ:  YOUR HONOR, ALL THE

22   DEFENDANTS WE'RE SENTENCING THIS MORNING HAVE RECEIVED

23   THE BENEFIT OF A 5K.1 MOTION FILED BY THE GOVERNMENT.

24   THAT IS NOT TO SAY THAT ALL OF THEIR COOPERATION IS

25   THE SAME, BUT WE ARE MOVING FOR A DEPARTURE AS TO EACH

1    AND EVERY ONE THESE FOUR DEFENDANTS.  I BELIEVE THAT

2    IS ONE OF THE REASONS WE HAD SCHEDULED --

3              THE COURT:  EACH OF THE FOUR DEFENDANTS.

4              MR. DOMINGUEZ:  ONE FOR MR. BOYD, MR.

5    MELLOT, MR. REEDER AND MR. SAMUELS.

6              THE COURT:  THERE IS ONE FOR MR. MELLOT.  I

7    HAD NOT HAD NOTICE OF THAT.

8              MR. DOMINGUEZ:  YES, YOUR HONOR.

9              YOUR HONOR, AS TO THESE FOUR DEFENDANTS, WE

10   HAVE BROKEN IT, BASICALLY, INTO TWO CATEGORIES,

11   COOPERATION THAT WE DEEMED TO BE VERY SIGNIFICANT,

12   BOTH IN THE TIME IT OCCURRED AND THE AMOUNT OF

13   INFORMATION, VOLUME OF INFORMATION GIVEN, AND WE

14   ATTRIBUTED THE COOPERATION OF MR. BOYD -- WE PUT MR.

15   BOYD'S COOPERATION IN THAT CATEGORY AND MR. REEDER'S

16   COOPERATION IN THAT CATEGORY.  BOTH OF THOSE

17   DEFENDANTS COOPERATED VERY EARLY ON.  THEY WERE ABLE

18   TO GIVE US VERY SUBSTANTIAL INFORMATION TO SPELL OUT

19   THE ENTIRE SCOPE OF THE CONSPIRACY AND THE OPERATIONS

20   OF THE RINGLEADER OF THE CONSPIRACY, MR. REEDER.  THAT

21   INFORMATION, INCLUDING THE SOURCES OF THE COCAINE AND

22   SOURCES FOR THE DISTRIBUTION OR REDISTRIBUTION, IF YOU

23   WILL, OF THAT COKE, SO WE BELIEVE THAT THEIR

24   COOPERATION WAS AMONG THE MOST SIGNIFICANT IN THE

25   CASE.

1       THERE WERE TWO FACTORS, ONE AS TO EACH

2   DEFENDANT THAT HURT THEIR COOPERATION.  THE ONE WITH

3   REGARD TO MR. REEDER, AND I THINK YOU GOT INTO THIS

4   WITH MR. DONATONI THIS MORNING, WAS THAT HE DISCLOSED

5   THAT HE WAS COOPERATING TO THE TARGET OF THE

6   INVESTIGATION.  WHILE AS MR. DONATONI CORRECTLY

7   INDICATED THE GOVERNMENT LANDED ON ITS FEET AT THE END

8   OF THE DAY, THE RESULT WAS THE EXPENDITURE OF GREATER

9   INVESTIGATIVE RESOURCES THAN WERE PERHAPS NECESSARY,

10  AND LOSS OF AN OPPORTUNITY TO MOVE FORWARD ON THE

11  INVESTIGATION AT AN EARLIER DATE.  IT ACTUALLY SET US

12  BACK.  SO THAT HURT MR. REEDER'S COOPERATION MOTION

13  AND IT'S REALLY THE ONLY THING THAT PREVENTS ME FROM

14  BEING HERE TODAY AND SAYING, GIVE THIS GUY THE MOST

15  CREDIT YOU POSSIBLY CAN FOR HIS COOPERATION BECAUSE HE

16  DESERVES IT.

17      NOW, WITH REGARD TO MR. BOYD, THERE WAS A

18  DIFFERENT INCIDENT AND IT DID AFFECT HIS COOPERATION

19  BUT IN A DIFFERENT WAY.

20      AS YOU RECALL, MR. BOYD VIOLATED THE TERMS

21  OF HIS PRETRIAL RELEASE, A COUPLE OF TIMES TESTING

22  POSITIVE FOR DRUG USE, THIS IS AFTER INDICTMENT, THIS

23  IS AFTER HE HAS BEEN COOPERATING.  THIS IS AFTER HE

24  HAS APPEARED BEFORE THE COURT.  THAT TYPE OF CONDUCT

25  CLEARLY IMPACTS HIS VALUE AS A WITNESS AND WOULD HAVE

1    IMPACTED HIS VALUE AS A WITNESS HAD WE PROCEEDED TO

2    TRIAL.  SO WE NEED TO MAKE NOTE OF THAT FACT AS WELL.

3              NOW, IF I MAY, YOUR HONOR, I WILL MOVE ON

4    TO MR. MELLOT AND MR. SAMUELS.  MR. MELLOT AND MR.

5    SAMUELS, BOTH IN TERMS OF THE VOLUME OF INFORMATION

6    THEY WERE ABLE TO GIVE, GAVE LESS THAN MR. REEDER AND

7    MR. BOYD, AND THAT IS WHY IT'S DESCRIBED AS MODERATE

8    COOPERATION IN THE GOVERNMENT'S SENTENCING CHART THAT

9    IS CONTAINED AT PAGES 14 AND 15 OF THE MEMORANDUM.

10   ALTHOUGH IT WAS LESS IN TERMS OF OVERALL VOLUME, YOUR

11   HONOR, I DON'T WANT TO DETRACT FROM THE SIGNIFICANT

12   NATURE OF THE COOPERATION GIVEN BY MR. MELLOT AND MR.

13   SAMUELS AS TO THIS COMPONENT OF THE CASE.  THE ONE

14   THING THAT WE NEEDED TO FILL OUT IN OUR INVESTIGATION

15   WAS THE DISTRIBUTION OF METHAMPHETAMINE THROUGH ED

16   REEDER AND MR. MELLOT AND MR. SAMUELS WERE ABLE TO

17   FILL OUT THAT PORTION OF THE CASE AND BE ABLE TO

18   DESCRIBE FOR US HOW THE METHAMPHETAMINE CAME INTO THE

19   CHESTER COUNTY PAGANS AND HOW IT WAS DISTRIBUTED.  SO

20   AS WITH REGARD TO MANY OF THE DEFENDANTS IN THIS CASE

21   THEY WERE INVOLVED IN THE COCAINE HALF OF THIS

22   CONSPIRACY, THESE TWO COOPERATORS WERE COOPERATORS

23   PRIMARILY ON THE METHAMPHETAMINE HALF OF CONSPIRACY

24   AND THAT'S WHY WE DEEMED IT APPROPRIATE TO FILE 5K.1

25   MOTIONS.  BUT AGAIN, I HAVE TO SAY WITH THAT CAVEAT OF

1   THEIR TIMELINESS WAS NOT THAT OF MR. BOYD AND MR.

2   REEDER, THEY DID NOT COME FORWARD IMMEDIATELY.  THEY

3   DID NOT COOPERATE WHEN FIRST APPROACHED.

4          IN FACT, WITH REGARD TO MR. SAMUELS, EVEN

5   THOUGH HE HAD THIS MEETING WITH HIS PARENTS AND HAD

6   CHANGED HIS LIFE AND BECOME A BORN AGAIN CHRISTIAN,

7   THE AGENTS MET WITH HIM SHORTLY THEREAFTER.  HE JUST

8   DID NOT WANT TO COOPERATE.  I DON'T HOLD THAT DECISION

9   AGAINST HIM.  I UNDERSTAND THE DECISION TO COOPERATE

10  AGAINST OTHERS IS A VERY DIFFICULT DECISION, BUT I

11  HAVE TO NOTE FOR THE COURT THAT EVEN THOUGH HE CHANGED

12  HIS LIFE AROUND, HIS DECISION TO COOPERATE AND CLEAN

13  UP HIS PRIOR BAD ACTS WAS NOT IMMEDIATE.

14         WITH REGARD TO MR. MELLOT.  THERE WAS SOME

15  MINIMIZATION OF HIS ROLE IN THE CONSPIRACY INITIALLY

16  BUT, AGAIN, HE DID EVENTUALLY COME CLEAN WITH REGARD

17  TO HIS ENTIRE ROLE IN THE COOPERATION AND WAS

18  IMPORTANT TO OUR DEVELOPING THE METHAMPHETAMINE

19  PORTION OF THE INVESTIGATION.

20         YOUR HONOR, I THINK THAT IS THE SUMMARY I

21  CAN GIVE YOU OF THEIR COOPERATION.  IF YOU HAVE ANY

22  PARTICULAR QUESTIONS, I WILL GLADLY ADDRESS THEM.

23         THE COURT:  NO, I DON'T.  I, OF COURSE,

24  HAVE READ YOUR SUBMISSION VERY CAREFULLY AND I

25  CERTAINLY COMMEND YOU ON THE EXCELLENCE OF IT.  IT'S A

1   VERY THOROUGH, WELL DONE JOB.

2           MR. DOMINGUEZ:  THANK YOU, YOUR HONOR.  I

3   HAVE TO SHARE CREDIT FOR THAT WITH MISS SYKES AND TWO

4   VERY EXCELLENT INVESTIGATORS WHO PUT THIS CASE

5   TOGETHER, AGENT AULDT AND CORPORAL BROSE, WHO WERE

6   SPECTACULAR TO WORK WITH.  THEIR TALENTS JUST CONTINUE

7   TO COME TO THE FOREFRONT EVEN THROUGHOUT THIS PORTION

8   OF THE CASE, WHICH IS USUALLY DOMINATED BY THE

9   LAWYERS.

10          YOUR HONOR, I HEARD THE PRESENTATIONS GIVEN

11  BY DEFENSE COUNSEL THIS MORNING AND ONE OF THE THINGS

12  THAT -- WELL, TWO THINGS THAT OCCURRED TO ME IS THAT

13  WE HAVE, AT LEAST WITH REGARD TO THREE DEFENDANTS,

14  PEOPLE WHO HAVE MADE AFFIRMATIVE CHOICES IN THEIR

15  LIFE.  AND I THINK MR. MAYNARD CORRECTLY STATES THAT

16  MR. SAMUELS MADE THAT CHOICE BEFORE HE WAS APPROACHED

17  BY LAW ENFORCEMENT.  I BELIEVE HE DOES DESERVE EXTRA

18  CREDIT FOR THAT.

19          I THINK WHAT WE ARE LOOKING AT WITH REGARD

20  TO ALL OF THESE DEFENDANTS IS THE GOOD AND THE BAD.

21  AND THEIR FAMILY MEMBERS, ALL OF WHOM CAME UP HERE AND

22  SEEM TO ME, DEMONSTRATE GREAT LOVE AND AFFECTION FOR

23  THESE INDIVIDUALS, TALKED A LITTLE BIT ABOUT THAT.

24  TALKED A LITTLE BIT ABOUT THEIR HISTORY OF ADDICTIONS

25  AND PROBLEMS WITH DRUGS, AND THE FACT THAT THEY WERE

1    BAD PEOPLE AND NOW HAVE BECOME GOOD PEOPLE.

2            IN SPEAKING TO THEM, AND I HAVE SPOKEN TO

3    MR. AND MRS. SAMUELS, I UNDERSTAND THEIR FRUSTRATION

4    HERE TODAY THAT THEIR SON IS BEING SENTENCED FOR BAD

5    ACTS AT A JUNCTURE IN HIS LIFE WHERE HE HAS SEEMINGLY

6    TURNED THINGS AROUND.

7            BUT THE REALITY OF COURSE, YOUR HONOR, IS

8    WE ARE ALWAYS SENTENCING FOR PRIOR BAD ACTS AND THAT

9    IS WHAT BRINGS PEOPLE BEFORE THE BAR OF THE COURT.

10   AND I HOPE THE FAMILY UNDERSTANDS THAT AND I HOPE THEY

11   UNDERSTAND THAT THE COURT AND THE GOVERNMENT

12   RECOGNIZES THAT THERE IS ALWAYS A COUPLE OF SETS OF

13   VICTIMS IN THESE CASES.  ONE VICTIM IN THIS CASE IS,

14   OBVIOUSLY, THE SOCIETY THROUGH THE DRUG USAGE AND THE

15   DISTRIBUTION OF DRUGS AND ALL THE HORRORS THAT

16   BRINGS.  THE SECOND VICTIM IS THE FAMILY AND THE PAIN

17   THEY MUST ENDURE SEEING THEIR LOVED ONE GO AWAY.

18           I RECOGNIZE THAT, BUT IT JUST DOES NOT

19   CHANGE WHAT THEY HAVE DONE IN THIS CASE.  I

20   DELIBERATELY LEFT OUT OF THAT STATEMENT MR. MELLOT

21   AND, YOU KNOW, YOUR HONOR, WHEN YOU ARE CONFRONTED

22   WITH TARGETS IN INVESTIGATION, YOU DO YOUR VERY BEST

23   TO PICK THE PEOPLE THAT ARE GOING TO BE COOPERATORS

24   AND WHO ARE GOING TO CHANGE THEIR LIFE.  I WISH THAT

25   WERE RIGHT WITH REGARD TO MR. MELLOT WHEN I MADE THAT

1   ASSESSMENT OF HIM AND PLEASED THAT HE MIGHT TURN HIS

2   LIFE AROUND.  UNFORTUNATELY, RECENT EVENTS DEMONSTRATE

3   THAT I WAS JUST WRONG.  FLAT OUT WRONG WITH REGARD TO

4   THAT.  AND THE MOST TROUBLING, I THINK, IS WHAT IS

5   CONTAINED IN PARAGRAPH 76 REGARDING PENDING CHARGES

6   WHEREIN THIS DEFENDANT WAS RECORDED ON AN ANSWERING

7   MACHINE APPARENTLY MAKING THREATS AGAINST A WOMAN WHO

8   HE CLEARLY HAS A PROBLEM WITH AND FAMILY SITUATIONS

9   WITH, BUT HE IS TELLING HER THAT SHE BETTER GET A GUN

10  REGISTERED AND SHE -- HE REFERS TO HER IN REALLY

11  UNSPEAKABLE TERMS THAT ARE SET FORTH IN 76 AND NEED

12  NOT BE RESTATED HERE.  AND I NOTE THAT ALTHOUGH HE

13  LOST A LEG, HE WAS, IN FEBRUARY OF THIS YEAR, DRIVING

14  WITHOUT A LICENSE ON A HARLEY DAVIDSON.  AND I KNOW HE

15  HAS BEEN DESCRIBED AS A FAMILY MAN HERE TO HIS

16  CHILDREN.  PERHAPS THAT IS TRUE WITH REGARD TO HIS

17  PARTICULAR FAMILY CIRCUMSTANCE.  BUT THE EVIDENCE DOES

18  NOT INDICATE THAT HE HAS TURNED HIS LIFE AROUND.  I'M

19  AFRAID THAT THAT MUST BE CONSIDERED BY THIS COURT IN

20  ITS SENTENCING DETERMINATION, CONSIDERED BY THE

21  GOVERNMENT IN ITS RECOMMENDATION.

22          IN LIGHT OF THAT, I REALLY BELIEVE THAT THE

23  RECOMMENDATION OF 48 MONTHS THAT I HAVE CONTAINED OR I

24  HAVE INCLUDED IN THE CHART IS PROBABLY A VERY GENEROUS

25  RECOMMENDATION FOR THIS DEFENDANT AND --

1          THE COURT:  ARE YOU TALKING ABOUT LAWRENCE

2     MELLOT?

3          MR. DOMINGUEZ:  YES, YOUR HONOR.

4          THE COURT:  YOU HAVE 54 MONTHS.

5          MR. DOMINGUEZ:  I'M SORRY, YOUR HONOR.  I

6     DO.  I STAND CORRECTED.

7          I THINK THAT --

8          THE COURT:  I UNDERSTAND WHAT YOU ARE

9     SAYING TO ME.

10         MR. DOMINGUEZ:  I THINK THAT RECOMMENDATION

11    MIGHT HAVE BEEN A LITTLE BIT GENEROUS IN LIGHT OF THIS

12    CONDUCT, AND I WISH WE HAD MADE A BETTER CHOICE WITH

13    REGARD TO MR. MELLOT AND I HOPE THAT THESE THINGS ARE

14    JUST BLIPS IN HIS LIFE AS A RESULT OF THIS FAMILY

15    CIRCUMSTANCE, BUT, AS I SAY, I'M AFRAID THAT THE COURT

16    MUST CONSIDER THAT.

17         YOUR HONOR, AGAIN, THAT CONCLUDES MY

18    PRESENTATION.  I THANK THE COURT FOR THE OPPORTUNITY

19    TO SPEAK HERE ON BEHALF OF THE GOVERNMENT AND I WILL

20    ANSWER ANY ADDITIONAL QUESTIONS THE COURT MAY HAVE.

21         THE COURT:  I DON'T THINK I HAVE ANY AT

22    THIS POINT.

23         MR. DOMINGUEZ:  THANK YOU, YOUR HONOR.

24         THE COURT:  I MAY BEFORE I FINISH MY

25    SENTENCING, BUT AS OF NOW, I DON'T.

1          JUST A COUPLE OF COMMENTS BEFORE I IMPOSE

2     SENTENCE.

3          THE OFFENSES INVOLVED HERE ARE VERY SERIOUS

4     OFFENSES HAVING TO DO WITH DRUG TRAFFICKING, AND

5     ANYBODY WHO WAS ENGAGED IN THAT KIND OF ACTIVITY

6     CERTAINLY MUST EXPECT THAT SOONER OR LATER HE IS GOING

7     TO BE APPREHENDED, HE IS GOING TO BE PUNISHED FOR HIS

8     ACTIVITIES.  WE CAN'T POSSIBLY CLOSE OUR EYES TO

9     OFFENSES OF THIS KIND, NO MATTER WHAT REVELATIONS MAY

10    HAVE OCCURRED IN THE MIND OF THE DEFENDANT SINCE THE

11    CONDUCT ITSELF, IT'S THE ACT ITSELF WHICH WAS A

12    KNOWING AND VOLUNTARY ACT THAT WAS COMMITTED AT A

13    CERTAIN TIME, AND THAT IS THE MATTER FOR WHICH THE

14    INDIVIDUAL IS -- HAS BEEN PROSECUTED.  NOT FOR WHAT HE

15    HAS DONE SINCE THAT TIME.

16         THERE ARE SOME CIRCUMSTANCES UNDER WHICH

17    HIS CONDUCT SINCE THAT TIME CAN BE TAKEN INTO

18    CONSIDERATION, EVEN OUR GUIDELINES, WHICH CONTROL THE

19    LEEWAY THAT A COURT MAY GIVE TO SENTENCING, ALLOW FOR

20    THAT KIND OF CONSIDERATION.

21         BUT ONCE AGAIN, WHEN THE CRIMES ARE OF A

22    NATURE SUCH AS THESE, AND THEY ARE ALL BASED ON A

23    CONSPIRACY IN CONNECTION WITH DRUG TRAFFICKING, THEY

24    MUST BE DEALT WITH IN A WAY THAT THE DEFENDANT WILL

25    FEEL THE STING OF THE LAW, BE PUNISHED FOR WHAT HE HAS

1    DONE.  EVEN THOUGH THAT MAY NOT BENEFIT SOCIETY IN THE

2    END, WE CAN'T ALLOW THE CRIME TO GO UNPUNISHED.  IF

3    FOR NO OTHER REASON THAN THE DETERRENT ASPECT TO

4    PREVENT OTHER PEOPLE FROM ENGAGING IN THAT KIND OF

5    CRIMINAL CONDUCT.

6            YOU MIGHT SAY, WELL, IT'S KIND OF A

7    WILDFIRE THAT CAN'T BE STOPPED.  I DOUBT THAT THAT IS

8    SO.  IN ANY EVENT, I DON'T THINK WE CAN EVER STOP

9    CRIME.

10           SO IT'S WITH THOSE THOUGHTS IN THE BACK OF

11   MY MIND AND WITH TAKING INTO CONSIDERATION THE

12   ARGUMENTS THAT HAVE BEEN ADVANCED BY COUNSEL FOR THE

13   DEFENDANTS, AS WELL AS THE STATEMENTS OF THE

14   DEFENDANTS AND THEIR WITNESSES, AND THE SUBMISSIONS

15   THAT I HAVE RECEIVED, WHICH HAVE BEEN SUBSTANTIAL,

16   THEY ARE ALL PART OF THE RECORD, AND ALSO TAKE INTO

17   CONSIDERATION THE STATEMENT OF THE UNITED STATES'

18   ATTORNEY REFLECTING THE GOVERNMENT'S POINT OF VIEW,

19   AND ATTEMPTING TO APPLY THE SENTENCING GUIDELINES IN A

20   MANNER CONSISTENT WITH THE SPIRIT AND PURPOSE OF THE

21   GUIDELINES, I AM NOW PREPARED TO IMPOSE SENTENCE.

22           SO FIRST, I WANT TO STATE AT THE OUTSET

23   THAT EACH SENTENCE THAT I IMPOSE IS TENTATIVE UNTIL I

24   DECLARE IT TO BE OFFICIAL.  IN THE EVENT THAT I SHOULD

25   MISSTATE SOMETHING, I WANT THE OPPORTUNITY TO CORRECT

1    IT.  I WILL INVITE COUNSEL TO ASSIST ME IN THAT

2    CONNECTION.

3            AND I WILL FIRST ASK JAMES BOYD, PLEASE, IF

4    YOU WILL PLEASE RISE.  PURSUANT TO THE SENTENCING

5    REFORM ACT OF 1984, IT IS THE JUDGMENT OF THE COURT

6    THAT THE DEFENDANT, JAMES BOYD, IS HEREBY COMMITTED TO

7    THE CUSTODY OF THE BUREAU OF PRISONS TO BE IMPRISONED

8    FOR A TERM OF 48 MONTHS.  UPON RELEASE FROM

9    IMPRISONMENT, THE DEFENDANT SHALL BE PLACED ON

10   SUPERVISED RELEASE FOR A TERM OF FIVE YEARS.  WITHIN

11   72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU OF

12   PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE

13   PROBATION OFFICE IN THE DISTRICT TO WHICH THE

14   DEFENDANT IS RELEASED.  WHILE ON SUPERVISED RELEASE,

15   THE DEFENDANT SHALL NOT COMMIT ANOTHER FEDERAL, STATE

16   OR LOCAL CRIME, SHALL OBSERVE THE STANDARD CONDITIONS

17   OF PROBATION, SUPERVISED RELEASE AS ADOPTED BY THE

18   COURT IN THE EASTERN DISTRICT OF PENNSYLVANIA, AND

19   SHALL COMPLY WITH THE FOLLOWING ADDITIONAL

20   CONDITIONS:  THE DEFENDANT SHALL NOT POSSESS ANY

21   FIREARMS OR DANGEROUS WEAPONS, THE DEFENDANT SHALL

22   REFRAIN FROM ANY UNLAWFUL USE OF A CONTROLLED

23   SUBSTANCE AND SUBMIT TO ONE DRUG TEST WITHIN 15 DAYS

24   OF RELEASE -- FROM RELEASE, OF THE RELEASE ON

25   SUPERVISION, AND SUBMIT TO AT LEAST TWO PERIODIC DRUG

1   TESTS THEREAFTER AS DIRECTED BY THE PROBATION

2   OFFICER.  IF DEEMED NECESSARY BY THE PROBATION

3   OFFICER, THE DEFENDANT SHALL PARTICIPATE IN A

4   TREATMENT PROGRAM FOR DRUG AND ALCOHOL ABUSE, AND

5   SHALL COMPLY WITH TESTING TO DETERMINE WHETHER OR NOT

6   THE DEFENDANT IS USING CONTROLLED SUBSTANCES.

7           IT IS FURTHER ORDERED THAT THE DEFENDANT

8   SHALL PAY TO THE UNITED STATES A FINE OF ONE THOUSAND

9   DOLLARS.  THE DEFENDANT IS FURTHER ORDERED TO COMPLY

10  WITH THE FORFEITURE PROVISIONS AS ARE DETAILED IN

11  COUNT THREE OF THE INDICTMENT.  THE DEFENDANT MAY

12  BEGIN TO MAKE PAYMENTS TOWARD THIS FINE WHILE IN

13  CUSTODY AS PART OF THE UNITED STATES BUREAU OF PRISONS

14  INMATE FINANCIAL RESPONSIBILITY PROGRAM.  ANY UNPAID

15  BALANCE SHALL BE PAID DURING THE PERIOD OF SUPERVISED

16  RELEASE.

17          IT'S FURTHER ORDERED THAT THE DEFENDANT

18  SHALL PAY THE UNITED STATES A SPECIAL ASSESSMENT AS

19  MANDATED BY STATUTE IN THE AMOUNT OF ONE HUNDRED

20  DOLLARS, WHICH SHALL BE DUE AND PAYABLE IMMEDIATELY.

21          DOES COUNSEL RECOMMEND ANY ADDITIONS OR

22  CORRECTIONS TO THAT SENTENCE THAT I MAY HAVE

23  OVERLOOKED?

24          MR. DOMINGUEZ:  YOUR HONOR, WITH REGARD TO

25  COUNT THREE, AS WE SAY, WE WITHDRAW THAT COUNT, SO IF

1    WE COULD JUST DELETE THE REFERENCE IN THE SENTENCE TO

2    THE FORFEITURE.

3              THE COURT:  YOU DON'T WANT THAT AS A

4    CONDITION?

5              MR. DOMINGUEZ:  CORRECT, YOUR HONOR.

6              THE COURT:  VERY FINE.  IF YOU DON'T WANT

7    IT AS A CONDITION, THEN WE WILL STRIKE THAT FROM THE

8    SENTENCE.

9              MR. DOMINGUEZ:  YOUR HONOR, WE HAVE, WITH

10   REGARD TO EACH ONE OF THESE DEFENDANTS, CONDUCTED OUR

11   OWN FINANCIAL ANALYSIS AND IT DOES NOT REVEAL ANY

12   ASSETS, SO WE ARE SATISFIED WITH THAT.

13             THE COURT:  VERY WELL.

14             ANY OTHER COUNSEL HAVE ANY ADDITIONS OR

15   CORRECTIONS?

16             MR. CANNON:  EXCEPT, YOUR HONOR, THAT MR.

17   BOYD BE AFFORDED THE PRIVILEGE OF SELF-REPORTING.

18             THE COURT:  SELF-REPORTING.

19             ALL RIGHT.  AS TO THE SENTENCE ITSELF,

20   THERE BEING NO OTHER COMMENTS, THAT SENTENCE IS NOW

21   HEREBY OFFICIALLY IMPOSED.  YOU ARE ADVISED THAT YOU

22   MAY HAVE THE RIGHT TO APPEAL FROM IT AND IF YOU CANNOT

23   AFFORD COUNSEL FOR THAT PURPOSE, COUNSEL WILL BE

24   FURNISHED TO YOU WITHOUT COSTS.

25             DO YOU UNDERSTAND THAT?

1           THE DEFENDANT:  SURE DO.

2           THE COURT:  ALL RIGHT, SIR.

3           I WILL ENTERTAIN THE OTHER MOTION, MR.

4  CANNON, AFTER I HAVE DONE THE OTHER SENTENCING.

5           MR. CANNON:  YES, YOUR HONOR.

6           THE COURT:  LAWRENCE MELLOT, WOULD YOU

7  PLEASE RISE.

8           PURSUANT TO THE SENTENCING REFORM ACT OF

9  1984, IT IS THE JUDGMENT OF THE COURT THAT THE

10  DEFENDANT, LAWRENCE MELLOT, IS HEREBY COMMITTED TO THE

11  CUSTODY OF THE BUREAU OF PRISONS TO BE IMPRISONED FOR

12  A TERM OF 84 MONTHS.  UPON RELEASE FROM IMPRISONMENT

13  THE DEFENDANT SHALL BE PLACED ON SUPERVISED RELEASE

14  FOR A TERM OF FIVE YEARS.  WITHIN 72 HOURS OF RELEASE,

15  FROM THE CUSTODY OF BUREAU OF PRISONS THE DEFENDANT

16  SHALL REPORT IN PERSON TO THE PROBATION OFFICE IN THE

17  DISTRICT TO WHICH THE DEFENDANT IS RELEASED.  WHILE ON

18  SUPERVISED RELEASE, THE DEFENDANT SHALL NOT COMMIT

19  ANOTHER FEDERAL STATE OR LOCAL CRIME, SHALL COMPLY

20  WITH THE 13 STANDARD CONDITIONS THAT HAVE BEEN ADOPTED

21  BY THIS COURT AND SHALL COMPLY WITH THE FOLLOWING

22  ADDITIONAL CONDITIONS:  THE DEFENDANT SHALL

23  PARTICIPATE IN A PROGRAM OF TESTING AND TREATMENT FOR

24  DRUG ABUSE AS DIRECTED BY THE PROBATION OFFICER UNTIL

25  SUCH TIME AS THE DEFENDANT IS RELEASED FROM THE

1    PROGRAM BY THE PROBATION OFFICE.  THE DEFENDANT SHALL

2    NOT POSSESS -- SHALL NOT ILLEGALLY POSSESS A

3    CONTROLLED SUBSTANCE.

4            IT IS FURTHER ORDERED THAT THE DEFENDANT

5    SHALL PAY TO THE UNITED STATES A SPECIAL ASSESSMENT OF

6    ONE HUNDRED DOLLARS AS MANDATED BY FEDERAL STATUTE

7    WHICH SHALL BE DUE AND PAYABLE IMMEDIATELY.

8            IT IS FURTHER ORDERED THAT THE DEFENDANT

9    SHALL PAY TO THE UNITED STATES A FINE OF TWO THOUSAND

10   DOLLARS WHICH, LIKEWISE, SHALL BE DUE AND PAYABLE

11   IMMEDIATELY.

12           THE DEFENDANT SHALL MAKE FINE PAYMENTS FROM

13   ANY WAGES THAT HE MAY EARN IN PRISON IN ACCORDANCE

14   WITH THE BUREAU OF PRISONS INMATE FINANCIAL

15   RESPONSIBILITY PROGRAM.  THE PAYMENTS UNDER THAT

16   PROGRAM SHALL BE NOT LESS THAN ONE HUNDRED DOLLARS PER

17   YEAR.

18           DOES THAT REFLECT THE AVERAGE EARNINGS?

19           PROBATION OFFICER:  APPROXIMATELY, YES,

20   SIR.

21           THE COURT:  APPROXIMATELY.

22           NOT LESS THAN THAT.  ANY BALANCE REMAINING

23   UPON RELEASE FROM CUSTODY SHALL BE PAID AT A RATE OF

24   NO LESS THAN FIFTY DOLLARS PER MONTH.

25           I WILL ADD IN YOUR CASE, MR. MELLOT, THAT

1    UNDER THE GUIDELINES, YOUR CUSTODIAL PROVISION SET

2    FORTH A BRACKET OF 92 TO 105 MONTHS, THERE HAS BEEN A

3    5K FILED ON YOUR BEHALF BY THE GOVERNMENT BECAUSE YOU

4    HAVE COMPLIED WITH THE REQUISITE FOR OBTAINING SUCH A

5    MOTION, AND THROUGH YOUR COOPERATION WITH THE

6    GOVERNMENT, YOU ARE BEING GIVEN CREDIT FOR THAT.  BUT

7    AT THE SAME TOKEN, THAT DOES NOT MEAN THAT YOU SHOULD

8    BE REWARDED FOR THE KIND OF CONDUCT THAT YOU ARE STILL

9    APPARENTLY ENGAGING IN AND WHICH IS ALARMING TO THE

10   COURT.  THAT'S THE REASON YOUR SENTENCE HAS BEEN

11   IMPOSED AS IT HAS BEEN.  AND I THOUGHT I WOULD STATE

12   THAT, SO YOU WOULD UNDERSTAND THAT.

13            IS THERE ANYTHING FURTHER ANY COUNSEL WOULD

14   CARE TO STATE TO THE COURT OR SUGGEST TO THE COURT?

15            MR. DOMINGUEZ:  NOTHING FROM THE

16   GOVERNMENT, YOUR HONOR.

17            MR. HUFFMAN:  YES, YOUR HONOR.  JUST THAT

18   MR. MELLOT WOULD BE A GOOD CANDIDATE FOR TURNING

19   HIMSELF IN.

20            THE COURT:  I WILL CONSIDER THAT AFTER I

21   HAVE IMPOSED ALL THE SENTENCES.  THANK YOU.

22            ALL RIGHT.  THAT SENTENCE IS HEREBY

23   OFFICIALLY IMPOSED.

24            YOU ARE ADVISED THAT YOU MAY HAVE THE RIGHT

25   TO APPEAL FROM IT.  IF YOU CAN'T AFFORD COUNSEL FOR

1   THAT PURPOSE, COUNSEL WILL BE FURNISHED TO YOU WITHOUT

2   COSTS.

3           DO YOU UNDERSTAND THAT?

4           THE DEFENDANT:  YES.

5           THE COURT:  THANK YOU, SIR.  PLEASE BE

6   SEATED.

7           ROBERT REEDER.

8           THE DEFENDANT:  YES, YOUR HONOR.

9           THE COURT:  PURSUANT TO THE SENTENCING

10  REFORM ACT OF 1984, IT IS THE JUDGMENT OF THE COURT

11  THAT THE DEFENDANT, ROBERT REEDER, IS HEREBY COMMITTED

12  TO THE CUSTODY OF THE BUREAU OF PRISONS, TO BE

13  IMPRISONED FOR A TERM OF 60 MONTHS.  UPON RELEASE FROM

14  IMPRISONMENT, THE DEFENDANT SHALL BE PLACED ON

15  SUPERVISED RELEASE FOR A TERM OF FIVE YEARS.  WITHIN

16  72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU OF

17  PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE

18  PROBATION OFFICE IN THE DISTRICT TO WHICH THE

19  DEFENDANT IS RELEASED.  WHILE ON SUPERVISED RELEASE,

20  THE DEFENDANT SHALL NOT COMMIT ANOTHER FEDERAL, STATE

21  OR LOCAL CRIME, SHALL OBSERVE THE STANDARD CONDITIONS

22  OF PROBATION AND SUPERVISED RELEASE AS ADOPTED BY THE

23  COURT IN THE EASTERN DISTRICT OF PENNSYLVANIA, AND

24  SHALL COMPLY WITH THE FOLLOWING ADDITIONAL

25  CONDITIONS:  THE DEFENDANT SHALL NOT POSSESS ANY

1    FIREARM OR DANGEROUS WEAPONS.   THE DEFENDANT SHALL

2    REFRAIN FROM ANY UNLAWFUL USE OF A CONTROLLED

3    SUBSTANCE AND SUBMIT TO ONE DRUG TEST WITHIN 15 DAYS

4    OF RELEASE ON SUPERVISION AND SUBMIT TO AT LEAST TWO

5    PERIODIC DRUG TESTS THEREAFTER AS DIRECTED BY THE

6    PROBATION OFFICE.

7            IF DEEMED NECESSARY BY THE PROBATION

8    OFFICE, THE DEFENDANT SHALL PARTICIPATE IN A TREATMENT

9    PROGRAM FOR DRUG AND ALCOHOL ABUSE AND SHALL COMPLY

10   WITH TESTING TO DETERMINE WHETHER OR NOT THE DEFENDANT

11   IS USING CONTROLLED SUBSTANCES.

12           IT IS FURTHER ORDERED THE DEFENDANT SHALL

13   PAY TO THE UNITED STATES A FINE OF ONE THOUSAND

14   DOLLARS, WHICH SHALL BE DUE AND PAYABLE IMMEDIATELY.

15           IT IS FURTHER ORDERED THAT THE DEFENDANT

16   SHALL PAY TO THE UNITED STATES A SPECIAL ASSESSMENT OF

17   ONE HUNDRED DOLLARS AS MANDATED BY STATUTE, WHICH

18   SHALL BE DUE AND PAYABLE IMMEDIATELY.   THE DEFENDANT

19   MAY BEGIN TO MAKE PAYMENT TOWARD THE FINE WHILE IN

20   CUSTODY AS PART OF THE UNITED STATES BUREAU OF PRISON

21   INMATE FINANCIAL RESPONSIBILITY PROGRAM, WHICH

22   PAYMENTS SHALL BE NOT LESS THAN ONE HUNDRED DOLLARS

23   PER YEAR.   ANY UNPAID BALANCE SHALL BE PAID DURING THE

24   PERIOD OF SUPERVISED RELEASE IN REGULAR INSTALLMENTS,

25   AS FIGURED BY THE PROBATION OFFICE WITH APPROVAL OF

1   THE COURT.

2           ANY ADDITIONS OR CORRECTIONS BY COUNSEL?

3           MR. DONATONI: NONE, YOUR HONOR. WHEN THE

4   WHEEL COMES AROUND AGAIN, I WILL HAVE SOMETHING TO ASK

5   FOR.

6           THE COURT: THE SENTENCE IS HEREBY

7   OFFICIALLY OPPOSED. YOU CAN APPEAL FROM IT. IF YOU

8   CAN'T AFFORD COUNSEL FOR THAT PURPOSE, COUNSEL WILL BE

9   FURNISHED TO YOU WITHOUT COSTS.

10          DO YOU UNDERSTAND THAT?

11          MR. DONATONI: WE DO, SIR.

12          THE DEFENDANT: YES, YOUR HONOR.

13          THE COURT: THANK YOU.

14          RUSSELL SAMUELS, WILL YOU COME FORWARD.

15  THAT'S GOOD. YOU CAN STAY RIGHT THERE.

16          PURSUANT TO THE SENTENCING REFORM ACT OF

17  1984, IT IS THE JUDGMENT OF THE COURT THE DEFENDANT,

18  RUSSELL SAMUELS, IS HEREBY COMMITTED TO THE CUSTODY OF

19  BUREAU OF PRISONS TO BE IMPRISONED FOR A TERM OF 48

20  MONTHS. UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT

21  SHALL BE PLACED ON SUPERVISED RELEASE FOR A TERM OF

22  FIVE YEARS. WITHIN 72 HOURS OF RELEASE FROM THE

23  CUSTODY OF BUREAU OF PRISON, THE DEFENDANT SHALL

24  REPORT IN PERSON TO THE PROBATION OFFICE IN THE

25  DISTRICT TO WHICH THE DEFENDANT IS RELEASED. WHILE ON

1    SUPERVISED RELEASE, THE DEFENDANT SHALL NOT COMMIT

2    ANOTHER FEDERAL, STATE OR LOCAL CRIME, SHALL OBSERVE

3    THE STANDARD CONDITIONS OF PROBATION AND SUPERVISED

4    RELEASE AS ADOPTED BY THE COURT IN THE EASTERN

5    DISTRICT OF PENNSYLVANIA, AND SHALL COMPLY WITH THE

6    FOLLOWING ADDITIONAL CONDITIONS:  THE DEFENDANT SHALL

7    NOT POSSESS ANY FIREARMS OR DANGEROUS WEAPONS, THE

8    DEFENDANT SHALL REFRAIN FROM ANY UNLAWFUL USE OF A

9    CONTROLLED SUBSTANCE AND SUBMIT TO ONE DRUG TEST

10   WITHIN 15 DAYS OF RELEASE UPON SUPERVISION AND SUBMIT

11   TO AT LEAST TWO PERIODIC DRUG TESTS THEREAFTER AS

12   DIRECTED BY THE PROBATION OFFICE.  IF DEEMED NECESSARY

13   BY THE PROBATION OFFICE, THE DEFENDANT SHALL

14   PARTICIPATE IN A TREATMENT PROGRAM FOR DRUG AND

15   ALCOHOL ABUSE AND SHALL COMPLY WITH TESTING TO

16   DETERMINE WHETHER OR NOT THE DEFENDANT IS USING

17   CONTROLLED SUBSTANCES.

18            IT IS FURTHER ORDERED THAT THE DEFENDANT

19   SHALL PAY THE UNITED STATES A FINE IN THE AMOUNT OF

20   TWO THOUSAND FIVE HUNDRED DOLLARS, WHICH SHALL BE DUE

21   AND PAYABLE IMMEDIATELY.  THE DEFENDANT MAY BEGIN TO

22   MAKE PAYMENTS TOWARD THIS FINE UNDER THE CUSTODY

23   INMATE FINANCIAL RESPONSIBILITY PROGRAM.  ANY UNPAID

24   BALANCE SHALL BE PAID DURING THE PERIOD OF SUPERVISED

25   RELEASE FROM.

1           IT IS FURTHER ORDERED THAT THE DEFENDANT

2   SHALL PAY TO THE UNITED STATES A SPECIAL ASSESSMENT OF

3   ONE HUNDRED DOLLARS AS MANDATED BY THE STATE, WHICH

4   SHALL BE DUE AND PAYABLE IMMEDIATELY.

5           ANY FURTHER ADDITIONS OR CORRECTIONS BY

6   COUNSEL?

7           MR. DOMINGUEZ:  NONE, YOUR HONOR.

8           MR. MAYNARD:  NO, YOUR HONOR.

9           THE COURT:  THE SENTENCE IS HEREBY

10  OFFICIALLY IMPOSED AND YOU ARE ADVISED YOU MAY HAVE

11  THE RIGHT TO APPEAL FROM IT.  IF YOU CAN'T AFFORD

12  COUNSEL FOR THAT PURPOSE, COUNSEL WILL BE FURNISHED TO

13  YOU WITHOUT COSTS.

14          DO YOU UNDERSTAND THAT?

15          THE DEFENDANT:  YES, I DO.

16          MR. DOMINGUEZ:  EXCUSE ME, YOUR HONOR, YOU

17  MADE SPECIFIC REFERENCE TO THE GRANT OF 5K WITH REGARD

18  TO MR. MELLOT.  I KNOW IT'S IMPLICIT FROM THE NUMBERS.

19          THE COURT:  THANK YOU.  I DO WANT TO STATE

20  FOR THE RECORD THAT -- THE MOTIONS UNDER 5K.1.1, IS

21  THAT RIGHT?

22          MR. DOMINGUEZ:  THAT'S CORRECT.

23          THE COURT:  HAVE BEEN FILED BY THE

24  GOVERNMENT IN THE CASE IN EACH DEFENDANT HERE AND EACH

25  OF THOSE MOTIONS IS GRANTED.  AND THE SENTENCES

1    REFLECT THAT GRANTING OF THAT MOTION, THOSE MOTIONS.

2           MR. HUFFMAN:  YOUR HONOR, I HAVE ONE

3    CONCERN IN REFERENCE TO LAWRENCE MELLOT.

4           THE COURT:  LOUDER, IF YOU WILL, PLEASE.

5           THERE IS A MICROPHONE RIGHT IN FRONT OF

6    YOU.

7           MR. HUFFMAN:  I HAVE ONE CONCERN IN

8    REFERENCE TO YOUR SENTENCE OF LAWRENCE MELLOT, AND

9    THAT IS THAT YOU WENT ABOVE THE PROSECUTION'S

10   RECOMMENDATIONS FOR REASONS THAT NONE OF THESE THINGS

11   HAVE BEEN PROVEN AGAINST HIM.  THE RECENT EVENTS THAT

12   YOU WEIGHED YOUR SENTENCE HEAVILY ON.

13          THE COURT:  I UNDERSTAND THAT.

14          MR. HUFFMAN:  THAT IS A BIG CONCERN TO ME,

15   YOUR HONOR.

16          THE COURT:  WELL, ALL RIGHT.  I'M SORRY.

17   IT CONCERNS ME, BUT LET ME POINT OUT TO YOU THAT THE

18   GUIDELINES FOR HIS OFFENSE, AS SET FORTH IN THIS

19   REPORT ARE 92 TO 100 15 MONTHS.  I SENTENCED HIM TO

20   84.  SO THAT IT DOES NOT EVEN REQUIRE A SPECIAL

21   ARTICULATION AS TO WHY I GAVE HIM 84.  I TOLD YOU THAT

22   I TOLD HIM THAT BECAUSE I WANTED HIM TO KNOW THAT

23   THOSE THINGS DO COUNT.  I'M SPEAKING ABOUT THE

24   TERRORISTIC ACTIVITIES THAT HE HAS ENGAGED IN BOTH

25   WITH VIOLENCE.  THE FACT THAT ONE COUNSEL OR THE

1    OTHER, INCLUDING GOVERNMENT COUNSEL, MAY HAVE MADE A

2    RECOMMENDATION OF A CERTAIN SENTENCE DOES NOT MEAN

3    THAT THAT IS BINDING ON THE COURT.  IT'S NOT.  I THINK

4    THE GOVERNMENT WOULD BE THE FIRST TO AGREE WITH THAT.

5    I HAVE, HOWEVER, GIVEN YOUR CLIENT THE BENEFIT OF THE

6    5K.1.1 MOTION THAT HAS BEEN FILED.  THAT'S NOT

7    MANDATORY EITHER, BUT I DID THAT.  YOU UNDERSTAND ALL

8    THAT?

9          MR. HUFFMAN:  YES, YOUR HONOR.

10         THE COURT:  ALL RIGHT.

11         YOU HAVE AN EXCEPTION IF YOU WANT ONE.

12         ANYTHING ELSE, COUNSEL, BEFORE WE ADJOURN

13    THIS SESSION?

14         MR. DOMINGUEZ:  YOUR HONOR --

15         THE COURT:  WE HAD A COUPLE OF -- I

16    UNDERSTAND THAT EACH DEFENSE COUNSEL, I BELIEVE, IS

17    JOINING IN THIS MOTION FOR SELF-SURRENDER, IS THAT

18    CORRECT, OR IS THERE SOMEBODY WHO IS NOT?

19         MR. DONATONI:  I MAKE THAT MOTION

20    AFFIRMATIVELY ON BEHALF OF MR. REEDER.

21         THE COURT:  OKAY.  WHO ELSE?

22         MR. HUFFMAN:  I AM MAKING THAT MOTION.

23         THE COURT:  MR. CANNON, YOU MADE THE

24    MOTION?

25         MR. CANNON:  YES.

1          MR. HUFFMAN:  MR. MELLOT, AS WELL.

2          MR. MAYNARD:  AND MR. SAMUELS.

3          MR. HUFFMAN:  I MADE THAT MOTION ON BEHALF

4    OF MR. MELLOT.

5          THE COURT:  I ASSUMED YOU WOULD, AND NOW I

6    THINK I SHOULD CALL UPON THE GOVERNMENT TO SEE WHAT

7    THE GOVERNMENT'S POSITION IS IN CONNECTION WITH THAT.

8          MR. DOMINGUEZ:  YOUR HONOR, ALL OF THESE

9    DEFENDANTS HAVE BEEN ON PRETRIAL RELEASE.  I REALIZE

10   THAT THEIR SENTENCES CHANGES SOME OF THE DYNAMICS

11   HERE, BUT WE BELIEVE THAT SELF-SURRENDER IS

12   APPROPRIATE IN THE CASE AS WELL.

13         THE COURT:  IN WHICH CASE?

14         MR. DOMINGUEZ:  AS TO ALL FOUR DEFENDANTS.

15         WE HAVE NO OBJECTION AS TO ANY OF THE FOUR.

16         THE COURT:  AS TO ANY OF THE FOUR.

17         MR. DOMINGUEZ:  WE HAVE SOME CONCERNS ABOUT

18   MR. MELLOT, YOUR HONOR, JUST GIVEN THE NUMBER OF

19   MONTHS BUT, YOUR HONOR, I GUESS I WOULD HAVE NO

20   OBJECTION AS TO ANY OF THEM.

21         THE COURT:  VERY WELL.  IF THAT'S THE

22   GOVERNMENT'S POSITION, THEN I DON'T KNOW WHY I SHOULD

23   NOT ACCEDE TO THAT.

24         VERY WELL.  MY EFFICIENT DEPUTY CLERK HAS

25   ALREADY PREPARED ORDERS IN CONNECTION WITH THIS

1    MATTER, WHICH I SHALL NOW SIGN AND I WILL READ IT SO

2    YOU UNDERSTAND.

3            NOW, THIS 29TH DAY OF JUNE, 1999, THE ABOVE

4    NAMED DEFENDANT HAVING BEEN SENTENCED TO THE CUSTODY

5    OF THE BUREAU OF PRISONS, IS SUSPENDED UNTIL MONDAY,

6    JULY 19, 1999, AT WHICH TIME THE DEFENDANT IS DIRECTED

7    TO REPORT TO THE INSTITUTION DESIGNATED BY THE BUREAU

8    OF PRISONS NO LATER THAN 2 P.M., TO COMMENCE SERVING

9    SAID SENTENCE.

10           I WILL SIGN THESE, ONE IN EACH CASE.

11           NOW, COUNSEL, LET ME IMPRESS UPON YOU THE

12    IMPORTANCE OF YOUR STAYING IN COMMUNICATION WITH THE

13    UNITED STATES MARSHAL'S OFFICE SO THAT YOU WILL KNOW

14    WHAT INSTITUTION HAS BEEN DESIGNATED FOR YOUR CLIENT

15    AND THAT YOU ALSO STAY IN CLOSE COMMUNICATION WITH

16    YOUR CLIENT SO THAT HE WILL BE AVAILABLE AND READY TO

17    REPORT AT THE TIME DESIGNATED.

18           ALSO, I WANT TO SPECIFICALLY ADVISE EACH

19    INDIVIDUAL DEFENDANT THAT IF YOU, FOR ANY REASON,

20    SHOULD FAIL TO APPEAR AT THE TIME AND PLACE

21    DESIGNATED, YOU WOULD BE SUBJECT TO FURTHER

22    PROSECUTION. I THINK YOU UNDERSTAND THAT.

23           ANY QUESTIONS TO ANY OF THAT?

24           MR. DONATONI: ONE, YOUR HONOR. I HAVE HAD

25    SOME EXPERIENCE IN THE PAST WHERE DESIGNATIONS HAVE

1    NOT BEEN MADE WITHIN A 30-DAY PERIOD. IF THAT IS NOT

2    THE CASE, SIR, IS THE ORDER FURTHER REFLECTING THAT

3    THEY SHOULD REPORT TO THE MARSHAL'S OFFICE HERE, OR

4    HOW WOULD THE COURT LIKE TO PROCEED IN THE EVENT THAT

5    --

6           THE COURT: THEY WILL BE DESIGNATED BY THAT

7    TIME. IF THEY ARE NOT, I WILL BE ISSUING ANOTHER

8    ORDER.

9           MR. DONATONI: THANK YOU, SIR.

10          MR. MAYNARD: WITH RESPECT TO THE DATE,

11    YOUR HONOR, JULY 19TH, WOULD THAT BE APPLICABLE TO ALL

12    FOUR DEFENDANTS?

13          THE COURT: ALL FOUR.

14          MR. MAYNARD: THANK YOU.

15          THE COURT: ALL RIGHT. NOTHING ELSE. I

16    WANT TO THANK EVERYBODY WHO CAME HERE ON BEHALF OF ANY

17    OF THESE DEFENDANTS FOR YOUR INTEREST AND SUPPORT.

18    WHAT IS PAST IS PAST. IT IS ON THEM. THEY ARE PAYING

19    FOR IT. BUT WHAT IS AHEAD IS MORE ENCOURAGING AND

20    THEY WILL BE ABLE TO USE ALL OF THE ENCOURAGEMENT AND

21    SUPPORT THEY CAN GET FROM PEOPLE LIKE YOU WHO CARE

22    ABOUT THEM. DON'T LET THEM GET AWAY FROM YOU AGAIN.

23    THANK YOU VERY MUCH.

24          WE ARE ADJOURNED.

25          (COURT ADJOURNED AT 11:55 A.M.)

1          I CERTIFY THAT THE FOREGOING IS A CORRECT

2   TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

3   ABOVE-ENTITLED MATTER.

4

5

6

7   DATE                    OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I-N-D-E-X

2    WITNESS             DIRECT CROSS REDIRECT RECROSS

3    PETER D'ONOFRIO        10

4    JAMES BOYD             12

5    BRENDA A. BOYD         15

6    GREGORY AULDT          23

7    JAMES L. BOYD          28

8    JANE REID              38

9    CAROL MARIE FADDIS     44      47

10   LAWRENCE MELLOT        52

11   ROBERT REEDER          64

12   RALPH SAMUELS          66

13   DWIGHT MILLER          70

14   RUSSELL SAMUELS        73

15

16                      - - -

17

18

19

20

21

22

23

24

25
```